84 N.Y.2d 252 (1994)
640 N.E.2d 125
616 N.Y.S.2d 458
In the Matter of Jewish Home and Infirmary of Rochester, New York, Inc., Respondent,
v.
Commissioner of New York State Department of Health et al., Appellants.
In the Matter of New York Association of Homes and Services for the Aging, Inc., Respondent,
v.
Commissioner of New York State Department of Health et al., Appellants.
Court of Appeals of the State of New York.
Argued May 3, 1994.
Decided June 30, 1994.
G. Oliver Koppell, Attorney-General, Albany (Victor Paladino, Jerry Boone and Peter H. Schiff of counsel), for appellants in the first above-entitled proceeding.
Cadwalader, Wickersham & Taft, New York City (Peter G. Bergmann, Kathy Hirata Chin and William J. Natbony of counsel), for respondent in the first above-entitled proceeding.
G. Oliver Koppell, Attorney-General, Albany (Victor Paladino, Jerry Boone and Peter H. Schiff of counsel), for appellants in the second above-entitled proceeding.
Cadwalader, Wickersham & Taft, New York City (Peter G. Bergmann, Kathy Hirata Chin and William J. Natbony of counsel), for respondent in the second above-entitled proceeding.
Lori R. Levinson, New York City, for the Greater New York Hospital Association, amicus curiae, in the second above-entitled proceeding.
Judges SIMONS, SMITH and CIPARICK concur with Judge TITONE; Judge LEVINE dissents and votes to reverse in a separate opinion in which Chief Judge KAYE and Judge BELLACOSA concur.
*256 TITONE, J.
These appeals have arisen in the aftermath of our 1991 decision in New York State Assn. of Counties v Axelrod (NYSAC) (78 N.Y.2d 158), in which we struck down a 1987 *257 Medicaid nursing home reimbursement rate adjustment on the ground that it was not rationally based. The new question raised by the present appeals is whether respondents, having conducted a study and revised the disputed rate adjustment in accordance with the results, may apply the revised rate schedule retroactively as a basis for computing petitioners' reimbursement for the years preceding its promulgation. We hold that such retroactive rate-making is impermissible under Public Health Law § 2807 (7) (a) and that the prohibition contained in that statute is not suspended because the belated rate decision was necessitated by litigation.
The facts underlying the 1987 rate adjustment are fully explored in our opinion in NYSAC (supra) and need not be repeated in detail here. Briefly stated, in October of 1985, the Department of Health (DOH) promulgated a new system for calculating Medicaid nursing home reimbursement rates. The new system, which was to be effective January 1986, was called "Long Term Care Case Mix Reimbursement System" and was built upon four categories of component cost variables. Reimbursement rates under this system were to be calculated, in part, on the individual facility's "case mix," which was to be determined by reference to 16 patient categories, corresponding roughly to the severity of the patients' illnesses and the intensity of the required care.
A few months into the new system, DOH concluded that a downward adjustment in rates was required to compensate for an over-all increase in facilities' reported "case mix indices" (CMI's), which DOH believed was attributable to the facilities' increased familiarity with the reporting method rather than to any genuine change in patient condition or level of need. Having "confirmed" its belief by comparing the 1985 and 1986 CMI's for certain patients, DOH adopted an across-the-board 3.035% reduction, which it termed a "recalibration adjustment."
The "recalibration" was challenged in a timely proceeding brought by a nonprofit association of the 62 counties in New York State. The litigation culminated in a decision by this Court holding that the promulgated reduction was irrational because, among other reasons, it was based on an assumption that had not been empirically documented and was not correlated, "even on average or mean," to any actual CMI increase based on factors other than patient deterioration or increased utilization of resources (NYSAC, 78 NY2d, at 167-168, supra). *258 As a result of this conclusion, we reinstated the judgment of Supreme Court in NYSAC, which had declared the recalibration regulation "null and void" and had remanded to the agency "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation" (order and final judgment, NYSAC).[1]
Following this remittal, DOH repealed the recalibration regulation and, after conducting an "analysis and study," the agency promulgated a new recalibration adjustment in December 1991, to be applied to the 1989-1991 rate years (10 NYCRR 86-2.31 [a]).[2] Unlike its predecessor, the new recalibration adjustment was ostensibly based on the individual experience of each nursing home. Additionally, the recalibration adjustment for the rate years between 1989 and 1991 was capped so that no facility would experience a reduction of more than 3.035%  the amount of the 1986 recalibration reduction that was invalidated in NYSAC.
To provide the required documentation, the agency compared the reported changes in facilities' CMI from 1985 to 1988, limiting the analysis to those patients who could be positively identified and traced through their Social Security numbers. The agency then subtracted from the percentage change a "length of stay" adjustment, which was supposed to account for actual changes in the care needs of the patients encompassed in the study. DOH's assumption was that the "length of stay" adjustment could be used as a means of approximating patient deterioration over time and that that measurement could, in turn, be used to draw inferences about what portion of the percentage increase in CMI represented an actual increase in a sicker population's demand for facilities' resources. DOH rejected other possible measurement criteria, such as patients' chronological age and combinations of other variables (gender, region, payor), because they did not yield the necessary statistical stability. DOH acknowledged, however, that the relationship between patient length of stay and patient acuity could not be statistically validated.
Petitioners Jewish Home and Infirmary of Rochester (Jewish *259 Home) and New York Association of Homes and Services for the Aging (NYAHSA) commenced these separate CPLR article 78 proceedings to challenge respondents' decision to apply the new recalibration adjustment retroactively to prior rate years. In support of their position, petitioners relied principally on Public Health Law § 2807 (7) (a), which requires that the Commissioner of Health give hospitals and other health-related service providers advance notice of their reimbursement rates. Both petitioners argued alternatively that the new recalibration adjustment was irrationally promulgated. Petitioner Jewish Home also complained about respondents' method of calculating its facility utilization.
The Supreme Court, Albany County, held in petitioners' favor in both cases, granting them essentially all of the relief that they sought. In the proceeding brought by NYAHSA, the court concluded that the new recalibration rate was flawed by the same defect as its predecessor because of the absence of any empirical analysis or validation to support it.
On respondents' appeals, the Appellate Division, Third Department, ruled that the new recalibration adjustment could not be applied retroactively to the rate years between 1989 and 1991 (190 AD2d 197 [Jewish Home]; 195 AD2d 822 [NYAHSA]). Inasmuch as the court decided the issue on this ground, it did not reach the substantive question of whether the new adjustment was irrational (see, NYAHSA, 195 AD2d, at 825, supra). In both cases, the Appellate Division enjoined respondents from applying the new recalibration adjustment to rate years 1989-1991 and remitted to the agency for recomputation of petitioners' rates for those years without using the invalidated regulation, requiring repayment of any reimbursement withheld as a result of that regulation.[3] In the Jewish Home appeal, the Appellate Division also upheld the Supreme Court's determination that respondents' method of computing facility utilization was irrational. This Court subsequently granted respondents leave to appeal in both cases. We now affirm.
The central issue on these appeals is whether, having had part of its existing method for computing nursing home reimbursement rates judicially nullified, DOH may promulgate a *260 new method and then apply that method in determining the rates for prior years. The determinative provision is Public Health Law § 2807 (7) (a), which provides: "The commissioner [of DOH] shall notify each hospital and health-related service of its approved rates of payment which shall be used in reimbursing for services provided to persons eligible for payments made by state governmental agencies at least sixty days * * * prior to the beginning of an established rate period for which the rate is to become effective." This provision, on its face, prohibits retroactive rate-making (Jordan Health Corp. v Axelrod, 67 N.Y.2d 935, 936).[4]
Despite Public Health Law § 2807 (7) (a)'s plain language, DOH contends that the statute does not bar its present attempt to apply its 1991 recalibration adjustment in the calculation of reimbursement rates for the two years before it was promulgated. Simply put, respondents' contention is that the statute was intended to apply only to the "normal rate-making process" and has no application to rate-making determinations where, as here, those determinations have been made in response to judicial decisions nullifying the prior rate. Respondents cite no case law or other cognizable authority to support their proffered proposition. Rather, they base their position largely on the a priori assumption that application of section 2807 (7) (a) in this context is "illogical" because all rates employed after judicial nullification are necessarily "retroactive" to the extent that they are used to reimburse providers for services rendered in prior years. For the reasons that follow, we reject respondents' effort to construct a detour around the clear mandate of Public Health Law § 2807 (7) (a).
First, respondents' a priori argument, which has been consistently rejected by the lower courts (Matter of Wellsville Manor Nursing Home v Axelrod, 142 AD2d 225; Hurlbut v Whalen, 58 AD2d 311, cited with approval in Jordan Health Corp. v Axelrod, supra, at 936) overstates the situation in a way that distorts analysis. Here, as in many analogous situations, the judicial decision that prompted the new rate-making decision invalidated only a discrete component of the rate calculus. The remainder of the preexisting system was left intact and continues to provide a viable and legally valid basis *261 for reimbursement. Thus, contrary to respondents' hyperbole, the rule that petitioners advance does not itself require any retroactive rate-making. Rather, it merely entails applying to the prior years a properly and timely promulgated method of computing rates  minus the element that was nullified.[5]
Second, respondents' contention that Public Health Law § 2807 (7) (a) was intended to apply only to the "normal ratemaking process" is belied by Public Health Law § 2808 (11). Enacted in 1992, that statute provides that the provisions of section 2807 (7) (a) relating to advance notification of residential health care facility rates "shall not apply to prospective or retroactive adjustments to rates that are based on rate appeals filed by [the] facility, audits, changes in patient conditions or acuity levels, the correction of errors or omissions of data or errors in the computations of such rates, the submission of cost report data from facilities without an established cost basis or as otherwise authorized by law." Manifestly, this provision pinpointing specific extraordinary situations in which the rule prohibiting retroactivity should not apply would be surplusage if, as respondents argue, that rule were intended in the first instance to apply only to the "normal rate-making process."
*262 Moreover, a review of the Legislature's handling of this retroactivity problem demonstrates the weakness in respondents' position. The Legislature adopted Public Health Law § 2808 (11) in 1992 to remedy a perceived flaw in Public Health Law § 2807 (7) (a) that arose as a result of Matter of Wellsville Manor Nursing Home v Axelrod (supra; see, L 1992, ch 25; Mem of A. Gottfried [Sponsor] in Support of Assembly Bill A 9461, Bill Jacket, L 1992, ch 25). In Wellsville, the Appellate Division applied section 2807 (7) (a) to prohibit retroactive revision of a new facility's rates based on its actual experience and reported costs. At the time of the enactment, the sponsors of the remedial legislation asserted that "[t]he current statute restricts the capacity of [DOH] to recognize legitimate rate adjustments to an already published rate" (Mem in Support, Senator Tully and Assemblyman Gottfried, Bill Jacket, L 1992, ch 25). Despite this understanding of Public Health Law § 2807 (7) (a)'s scope and despite the sponsors' manifest intention to draft a remedial statute that went beyond the narrow problem created by Wellsville Manor Nursing Home, the resulting legislation, Public Health Law § 2808 (11), does not address the question of retroactive application of the new recalibration adjustment. Significantly, this is not a case of mere legislative silence or inaction (see, Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 170; Clark v Cuomo, 66 N.Y.2d 185, 190-191). Rather, it is a case where the Legislature has addressed a subject and has, in fact, created a list of exceptions to a general rule, but has chosen to omit mention of one exception in particular. In such a case, the maxim expressio unius est exclusio alterius is applicable (see, McKinney's Cons Laws of NY, Book 1, Statutes § 240, at 412-413 ["where a statute creates provisos or exceptions as to certain matters the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned"]).
This maxim is especially apt in this situation, where the available documentation indicates that the question of the recalibration adjustment's retroactivity was deliberately not mentioned in the 1992 legislation. As respondents acknowledge in their briefs, Public Health Law § 2808 (11)'s language was the product of discussions between DOH officials and representatives of the residential health care industry. The statute's terms represent "the only exceptions [to section 2807 (7) (a)] that both industry and Health Department officials can agree upon," and "[the] situations * * * identified in *263 th[e] bill" are the ones in which, according to "[b]oth industry and Health Department officials agree * * * retroactive rate setting is acceptable" (letter from C. Murray, General Counsel for NY St Health Facilities Assn, to J. Marqusee, Asst Dir, Dept of Health [dated Nov. 26, 1991] [Murray letter], Bill Jacket, L 1992, ch 25). Most critically, the correspondence establishes that the parties to these discussions were well aware of the present dispute over the retroactive application of DOH's new recalibration rate and were evidently unable to reach a similar compromise for submission to the Legislature. According to the correspondence, whose accuracy respondents do not dispute, DOH agreed not to "attempt to construe [Public Health Law § 2808 (11)] as legislative authorization for retroactive recalibration such as the proposed regulation presently pending before the New York State Hospital Review and Planning Council"; instead, it would await a determination of "[t]he legality or lack thereof * * * based on other arguments" (Murray letter, op. cit.). Significantly, the Legislature subsequently failed to adopt proposed legislation authorizing retroactive recalibration on two separate occasions (Governor's Budget Bill, 1992; Governor's Budget Bill, 1993; see, Matter of Bliss v Bliss, 66 N.Y.2d 382, 389).
In short, viewed in realistic terms, the legislative history demonstrates that Public Health Law § 2808 (11)'s sponsors regarded section 2807 (7) (a) as having application well beyond the "normal rate-making process," that those sponsors perceived a need to modify the existing rule precluding retroactive rate adjustments and that, despite extensive discussion between the interested lobbying elements, no agreement could be reached about the proper resolution of the recalibration adjustment problem. This situation is reminiscent of that presented in Boreali v Axelrod (71 N.Y.2d 1, 13), in which, despite considerable lobbying by the various interested factions, efforts to achieve a legislative compromise failed. In Boreali, we rejected an attempt to circumvent the legislative process by resort to administrative rule-making. Here, respondents are attempting to circumvent the legislative process by invoking the judiciary's power to construe an existing statute. As in Boreali, we reject the present circumvention effort by declining to read into Public Health Law § 2807 (7) (a) an exception that respondents were unable to obtain through the legislative process.
The policy arguments respondents make in support of the proposed exception are also unpersuasive in light of the *264 foregoing background. It is respondents' contention that permitting the new recalibration adjustment to be applied retroactively would not contravene Public Health Law § 2807 (7) (a)'s goals, which were to enable providers to engage in advance planning and to thereby encourage them to take costsaving measures (see, Jordan Health Corp. v Axelrod, 67 N.Y.2d 935, supra; letter by Senator T. Lombardi, Jr. [Apr. 22, 1974], Bill Jacket, L 1974, ch 682; id., letter by Senator W. Anderson [May 10, 1974]; id., Budget Report). Respondents contend that since the new recalibration adjustment's 3.035% cap ensures that no provider will have a reimbursement rate that is lower than the rate prescribed under the invalidated rate, retroactive application of the new rate would not prejudice providers or interfere with the legislative purpose.
However appealing this argument may be as a matter of public policy, it is not a convincing one where, as here, the construction of a statute is at issue. The problem with the argument is, quite simply, that the statutory language and design do not support it. Respondents' argument asks us to read into Public Health Law § 2807 (7) (a)'s advance notice requirement a complex proviso that excepts from its reach rates made after judicial nullification in those special cases where the new rate does not exceed the rate that has been annulled. To construe the statute as incorporating such a conditional proviso would be to overstep the bounds of statutory construction and enter the forbidden realm of judicial legislating.[6]
Our refusal to read the policy-based exception advanced by respondents into the statute is informed, in part, by our awareness that the Legislature has already spoken on the issue of exceptions to retroactivity and, in so doing, has not adopted the "capping" approach that respondents assert is essential to the underlying legislative policy (see, Public Health Law § 2808 [11]). Our decision is also informed by our awareness that there are, in fact, competing policies to be weighed. On the one hand are the policy considerations that respondents cite; on the other are the policies that favor encouraging the State to act carefully and responsibly when it initially establishes its reimbursement rates. The latter policies *265 would, of course, militate against permitting respondents to apply newly promulgated rates retroactively following a judicial decision invalidating an unlawful or irrationally determined rate (see, Tallahassee Mem. Regional Med. Ctr. v Bowen, 815 F.2d 1435, cert denied 485 US 1020). The point is not that one or the other of these policies is wiser. Rather, the point is that it remains the task of the Legislature and not the judiciary to choose between them.
Finally, we note that nothing in our remittitur in NYSAC (78 N.Y.2d 158, supra) suggested that respondents were authorized to recast the annulled recalibration adjustment and then apply it retroactively. Our order in NYSAC merely reinstated a judgment that directed respondents "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation" (order and final judgment, NYSAC). The reinstated judgment makes no mention of a recomputation that includes a revised  and as yet unreviewed  recalibration element. Moreover, since the respondents in NYSAC did not make an alternative request for the right to recompute the reimbursement rates with a new recalibration adjustment, it cannot seriously be argued that this Court contemplated such relief, much less that it considered the effect that Public Health Law § 2807 (7) (a)'s antiretroactivity provisions would have on the Court's power to grant it.
For all of the foregoing reasons, we hold that respondents cannot apply the recalibration adjustment adopted in response to our decision in NYSAC to rate years occurring before the new adjustment was promulgated. Our holding on this point makes it unnecessary for us to resolve the merits of petitioners' alternative argument that the new recalibration adjustment, as embodied in the current version of 10 NYCRR 86-2.31, is itself arbitrary and capricious.
The only other issue remaining is whether respondents violated their own regulations in computing the rate for petitioner Jewish Home's services. Under 10 NYCRR 86-2.8 (c), the facility's utilization "[f]or reimbursement purposes" "shall be determined by using the higher of the minimum utilization factor of 90 percent of certified beds or the actual patient days of care as furnished by the facility." We agree with the Appellate Division that there is no rational basis for segmenting petitioner's facility into its two component parts  *266 a health-related facility and a skilled nursing facility  before making the determination contemplated by this regulation. The absence of a rational basis for this segmenting is highlighted by the fact that DOH requires that the actual utilization figures to be "furnished by the facility" under 10 NYCRR 86-2.8 (c) be calculated on the basis of the over-all occupation of the facility as a whole (10 NYCRR 86-2.2 [e]).
Accordingly, in both appeals, the order of the Appellate Division should be affirmed, with costs.
LEVINE, J. (dissenting).
The State Commissioner of Health (the Commissioner) has made a reasonable and unrefuted determination that a straightforward application of the socalled "RUG-II" (Resource Utilization Group) Medicaid reimbursement rate methodology to the 1989-1991 rate years would result in the State's nursing homes receiving reimbursement at rates which contain an inflationary factor not ascribable to the cost of patient care. Medicaid reimbursement rates containing such an inflationary factor unrelated to the cost of care would clearly transgress the fundamental statutory objective of health care reimbursement regulation that limits rates to the reasonable costs of efficiently operated facilities. Based upon its reading of New York State Assn. of Counties v Axelrod (78 N.Y.2d 158) (hereinafter NYSAC) and Public Health Law § 2807 (7) (a), a majority of this Court holds that the Commissioner is prevented from applying a rational, facility-specific methodology to eliminate that inflation. We disagree.
To understand why neither NYSAC (supra) nor Public Health Law § 2807 (7) (a) requires that result, some recapitulation of the evolution of the State's Medicaid rate reimbursement system through RUG-II may be helpful. Since the enactment of the Cost Control Act of 1969 (L 1969, ch 957), New York has set nursing home Medicaid reimbursement rates prospectively in advance of the applicable rate year, based upon each facility's allowable costs for a given prior year (the base year), trended forward to account for inflation (see, NYSAC, 78 NY2d, at 162). Except for distinctions between health-related facility (HRF) component units and skilled nursing facility (SNF) units in the same nursing home (see, Matter of Cortlandt Nursing Care Ctr. v Whalen, 46 N.Y.2d 979, 980), the prospective rates did not account for gradations in the level of care within each facility caused by differences in the relative severity of its patients' health problems. The RUG-II system, *267 adopted in January 1986, was designed to reflect fairly such bona fide differences in levels of care due to variations in patients' conditions, and also to provide an incentive for nursing homes to accept patients having greater care needs (see, NYSAC, 78 NY2d, at 162).
RUG-II's methodology for accomplishing the foregoing salutary goals is, first, to divide the entire spectrum of ill or disabled patients in the State's nursing homes into 16 Resource Utilization Groups, classified according to gradations of consumption of nursing home resources. Each patient's placement in one of the 16 RUG-II categories is determined by a detailed, comprehensive assessment of her or his condition and care needs on a Patient Review Instrument (PRI) form, which must be filled out by a registered nurse on the facility's staff and certified by the nursing home operator (see, id.). Each of the 16 RUG-II categories is assigned a numeric weight to reflect the relative health care resources utilized for that class of patients. That numeric weight constitutes the "case mix index" (CMI) for that group of patients. A nursing home facility's CMI is the weighted average of RUG-II categories for all of its residents at a particular time.
At the initial implementation of RUG-II in January 1986, the 1985 facility CMIs were used, which in turn were based upon 1985 PRIs prepared by the facility's patient-assessment staff. Those 1985 CMIs performed two functions. First, a facility's CMI/cost ratio was utilized, in comparison to Statewide mean CMI/cost ratios, to adjust up or down the facility's allowable costs for its 1983 base year. Generally, this meant that an efficiently operated facility with a higher CMI received a more favorable reimbursement rate. Second, and more importantly for this appeal, each facility's 1985 CMI is used as a benchmark for comparison with that facility's CMI in subsequent rate years. The facility's base year allowable direct operating costs component of its reimbursement rate is adjusted upward by the percentage increase in the facility's CMI, thereby providing an incentive for the facility to admit patients requiring more intensive care.
Even before the January 1, 1986 effective date of the RUG-II Medicaid rate reimbursement system, the Commissioner had anticipated that increases in reported facility CMIs subsequent to the initial 1985 CMIs would occur at least partly because of "paper optimization". The phenomenon of paper optimization comes from the fact that a facility's CMI is *268 derived from the levels of care of its residents as assessed by its staff on each resident's PRI. As already noted, the PRI assessment and reporting process is detailed and complex. Thus, it was natural to expect that a facility's CMI would be understated during the initial, introductory stage of the RUG-II system, and would increase as the facility's staff became more sophisticated in comprehensively and thoroughly completing each patient's PRI, despite the lack of any actual change in that patient's level of care (see, NYSAC, 78 NY2d, at 163). The Commissioner's supposition was supported by (1) scholarly research on similar, diagnostically based reimbursement systems in the health care field, in which paper optimization was identified (see, id., at 172 [Hancock, Jr., J., dissenting]); and (2) by a sample of 85 facilities that submitted PRI information on the same patients in March 1985 and June/July 1985, showing an increase in CMIs unexplainable by patient deterioration during this brief period.
When the anticipated increases in reported 1986 facility CMIs in fact took place (which, under RUG-II would require a corresponding increase in each facility's allowable direct operating costs for its base year), the Commissioner responded by promulgating the initial recalibration regulation, imposing an across-the-board 3.035% reduction in the direct operating costs component of nursing home Medicaid reimbursement rates. That recalibration regulation was annulled in NYSAC (supra). The majority in NYSAC characterized its decision as a "narrow holding of irrationality" (78 NY2d, at 167), basing that conclusion principally on two factors: (1) the absence of documentation that "all facilities had experienced  even on average or mean  a 3.035% increase in CMI attributable solely to improved PRI reporting compliance experience", and not at all to other possible causes (id., at 168); and (2) the application of a uniform percentage reimbursement rate reduction to all facilities, irrespective of whether some facilities experienced little or no increases in CMIs, or increases legitimately attributable to actually providing increased care of patients (id.).
Clearly, then, in deciding NYSAC this Court did not reject as irrational or lacking an evidentiary basis the Commissioner's determination that the increases in facility CMIs from 1985 to 1986 under the RUG-II methodology were at least partly caused by paper optimization. Moreover, the documentation of the existence of paper optimization was far more thoroughly established in the instant case than it was or could *269 have been in the NYSAC record. The Department of Health conducted a number of studies of the same patients in facilities between 1985 and 1988. These studies identified increases in CMIs which could not be attributed to the patients' deterioration due to the natural aging process. Thus, the studies confirm the original data and research literature upon which the Commissioner initially concluded that paper optimization was artificially increasing CMIs over the 1985 base year figures.
Because of the overriding statutory duty of the Commissioner to determine and certify only those Medicaid reimbursement rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" (Public Health Law § 2807 [3]), the Commissioner would have been highly derelict in approving nursing home facilities' reimbursement rates the direct costs components of which were artificially inflated by the paper optimization he found to have existed. Nonetheless, the Commissioner will be mandated to do so for the 1989-1991 rate years of the State's nursing homes under today's majority decision.
In our view, this unfortunate result reached by the majority is not compelled by Public Health Law § 2807 (7) (a) but proceeds from the majority's misinterpretation of the NYSAC judgment and the majority's failure to distinguish between a preexisting, approved facility reimbursement rate and a preexisting rate-making methodology. As will be explained below, that distinction undercuts the majority's rationale for deciding this appeal. The NYSAC judgment only became final and binding in June 1991 when this Court reinstated it in reversing the Appellate Division's order granting judgment to the NYSAC defendants. The NYSAC judgment invalidated the 1987 across-the-board recalibration regulation and directed the Commissioner "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation", without dictating the method of recomputation.[1]
*270 As petitioners Jewish Home and Infirmary of Rochester, New York, Inc. and New York Association of Homes and Services for the Aging, Inc. (hereinafter petitioners)[2] themselves point out, after the ruling in NYSAC (78 N.Y.2d 158, supra) under principles of stare decisis applicable without recourse to joinder by class action against a State agency (see, Brady v State of New York, 172 AD2d 17, 25, affd 80 N.Y.2d 596, cert denied ___ US ___, 113 S Ct 2998), the Commissioner was bound to accord the same relief to petitioners and other facilities similarly situated to the NYSAC plaintiffs. However, when the Commissioner and other NYSAC defendants appealed the initial NYSAC judgment, the automatic statutory stay of the judgment went into effect (CPLR 5519 [a] [1]). Thus, uncontestably, the only Medicaid reimbursement rates that had been fixed with respect to petitioners' nursing home facilities for the 1989-1991 rate years were those in which the former recalibration regulation, invalidated in NYSAC, had been applied. Clearly then, this is not a case where a favorable reimbursement rate was already in effect for the pertinent rate years and was then invalidly superseded by a less favorable rate adjustment retroactively applied to enforce recoupment of the resultant overpayments, and in which the appropriate judicial remedy is reinstatement of the original reimbursement rate (see, Matter of Wellsville Manor Nursing Home v Axelrod, 142 AD2d 225, lv denied 74 N.Y.2d 602; Hurlbut v Whalen, 58 AD2d 311, lv denied 43 N.Y.2d 643, cited with approval in Jordan Health Corp. v Axelrod, 67 N.Y.2d 935, 936-937).
It follows from the foregoing that in 1991, when the Commissioner, in conformity with the decree of NYSAC (supra), vacated petitioners' reimbursement rates for the 1989-1991 rate years (initially calculated and set prospectively on the basis of the nullified recalibration regulation), there were no preexisting, prospectively set reimbursement rates which could have been reinstated. At most, there was a preexisting methodology (the original RUG-II system methodology) which could have been employed for recomputing those rates. Thus, because of the absence here of any preexisting 1989-1991 rates to be restored once the invalid rates were nullified at petitioners' *271 behest, the inevitable consequence of the Commissioner's compliance with the NYSAC judgment was a retrospective determination of petitioners' reimbursement rates for the 1989-1991 rate years, in unavoidable noncompliance with the requirement of Public Health Law § 2807 (7) (a) that notice of an approved reimbursement rate be given to the facility at least 60 days "prior to the beginning of an established rate period for which the rate is to become effective".
The foregoing conclusion is not merely a matter of statutory construction, as the majority suggests. Simply put, without access to the time-machine of fantasy and science fiction, the Commissioner in 1991 could not comply with both the dictate of NYSAC requiring recomputation of the 1989-1991 Medicaid reimbursement rates, and the dictate of Public Health Law § 2807 (7) (a) that the recomputed rates must be announced 60 days before the beginning of the 1989-1991 rate years. Converting this physical and logical impossibility into an appropriate statement of legal principle, one can fairly conclude that petitioners, in seeking the benefit of the NYSAC judgment by way of a retroactive redetermination of their 1989-1991 rates, either waived their rights to advance notice under Public Health Law § 2807 (7) (a), or were not aggrieved by the Commissioner's noncompliance with that section.
The majority, in concluding (majority opn, at 260-261) that retroactive rate setting can be avoided here merely by requiring the Commissioner to apply for rate years 1989-1991 the original RUG-II methodology left intact after NYSAC voided the recalibration regulation, is relying on a non sequitur. Even if the Commissioner were bound to use the preexisting RUG-II methodology in complying with the mandate of the NYSAC judgment to recompute (in 1991) the reimbursement rates for rate years 1989-1991, the 1989-1991 rates so recomputed would be new rates, retroactively determined, i.e., rates never in existence or approved before 1991.
The majority apparently concedes that no specific preexisting facility Medicaid reimbursement rates set and approved without recalibration were in place for rate years 1989-1991 when the rates fixed under the recalibration regulation were overturned (see, majority opn, at 261, n 5). The majority seeks to avoid the conclusion that, therefore, any recomputation in 1991 of the 1989-1991 rates would necessarily result in new rates set retroactively, by asserting that the distinction between preexisting prospectively set and approved rates and a *272 preexisting rate-making methodology is "artificial" (id.). The majority finds such artificiality apparently because of the majority's conviction that "[a] methodology is simply the route by which the rate is reached, and where the methodology is established the rate amount necessarily follows" (id. [emphasis supplied]).
There are several answers to these propositions. The first, and most obvious, is that, in addition to lacking support in the record, it completely defies common sense that application of such a complex and intricate rate-setting methodology as the RUG-II system would inevitably and in some mechanical fashion result, for each nursing home in the State, in a specific "rate amount" that "necessarily follows". Second, even if this were so, the majority's obliteration of the distinction between a preexisting rate and a preexisting rate-setting methodology necessarily proceeds under the assumption that the NYSAC judgment required the Commissioner to recompute the 1989-1991 nursing home Medicaid reimbursement rates by pure application of the RUG-II methodology without the recalibration regulations. Unless in NYSAC the Commissioner was bound upon remittal for recomputation to apply the RUG-II methodology, it cannot even arguably be claimed that a specific "rate amount [would] necessarily follow[]". We have already quoted the pertinent decretal provision of the NYSAC judgment and, uncontestably, it did not dictate a methodology to be used upon recomputation. Indeed, the NYSAC judgment's direction to the Commissioner to "recompute" the rates without reference to the recalibration regulation would have been entirely superfluous under the majority's rationale that a preexisting rate for each nursing home was in place that "is easily identified: it is the rate that was used to calculate the 3.035% reduction" (id.).
A decree consistent with the majority's rationale would merely have directed the Commissioner to reinstate for each nursing home "the rate that was used to calculate the 3.035% reduction" (id.). This was relief the petitioners never even sought in NYSAC. While a mere mechanical addition of 3.035% to the existing 1989-1991 rates (fixed under the recalibration regulation) was sought by the NYSAC petitioners in postjudgment litigation, and was granted by the lower courts therein (see, 191 AD2d 932 and the order quoted, supra, at n 1), surely the majority would agree that those determinations by the lower courts have no binding effect whatsoever upon this Court in the instant case. Thus, the conclusion remains *273 inescapable that, when the mandate of the NYSAC judgment became effective in 1991, the 1989-1991 rates recomputed in compliance with that judgment would be new, as never before determined, adopted and approved, and retroactive.
Indeed, it is readily apparent that petitioners' actual objective here is not to forestall any retroactive recomputation of their reimbursement rates for the 1989-1991 rate years. Their prayers for relief in the petitions seek just such a recomputation. Rather, their purpose is to achieve complete judicial control over the Commissioner's recomputation, not only by the imposition of the RUG-II methodology as it existed before the original recalibration regulation was promulgated, but also tying the Commissioner's hands by limiting him to the performance of the purely ministerial act of adopting, as the new 1989-1991 rates for each nursing home, the preliminary rates that had been used in applying the recalibration regulation when the initial 1989-1991 rates were finally set and approved. As previously noted, this goes well beyond the prayer for relief in NYSAC.
Moreover, in fulfilling petitioners' objective to eliminate totally the exercise of any judgment by the Commissioner in recomputing the 1989-1991 Medicaid reimbursement rates as directed by us in NYSAC, the majority has radically departed from New York precedents. Although Federal reimbursement rate regulation decisions support judicial imposition upon the regulatory agency of a specific prior methodology after annulment of a rate regulation (see, Bowen v Georgetown Univ. Hosp., 488 US 204; Tallahassee Mem. Regional Med. Ctr. v Bowen, 815 F.2d 1435, cert denied 485 US 1020; Noland Hosp. & Clinic v Heckler, 762 F.2d 1561), New York courts have, wisely in our view, eschewed directing the Commissioner how to exercise his discretion and superior expertise when a rate determination has been annulled and the proceeding remitted for redetermination (see, Matter of Society of N. Y. Hosp. v Axelrod, 70 N.Y.2d 467, 475; Matter of Cabrini Med. Ctr. v Axelrod, 177 AD2d 824, 825, lv denied 79 N.Y.2d 755; Matter of Brookdale Hosp. Med. Ctr. v Axelrod, 120 AD2d 144, 147-148).[3]
Thus, up to now, we would have found it unthinkable that the Commissioner, after NYSAC invalidated the original recalibration regulation, would have been prevented by the preexisting RUG-II methodology from eliminating rate inflation *274 not attributable to the reasonable cost of efficient service, but to paper optimization, through ad hoc determinations of the 1989-1991 rates for each nursing home (see, Matter of Severino v Ingraham, 44 N.Y.2d 763, 764).
Under the compelling circumstances presented here, we also believe that the Commissioner may accomplish the same objective through a valid recalibration regulation. First, eliminating the effects on reimbursement rates of paper optimization through ad hoc decisions would impose an overpowering administrative burden, inevitably entailing delays in reimbursements which would benefit neither the nursing home industry nor its patient population. Thus, as a practical matter, it would be virtually impossible to eliminate paper optimization without implementation of a new recalibration regulation of general applicability. The absence of a recalibration regulation applicable to the 1989-1991 rate years would, thus, defeat the paramount statutory goal of limiting Medicaid reimbursement rates to only those amounts necessary to meet the costs "incurred by efficiently and economically operated facilities" (Public Health Law § 2807 [3]). Second, the nursing home industry was on notice in December 1985, even before the effective date of the RUG-II system, that recalibration of rates might be necessary by reason of paper optimization, and, of course, the original recalibration regulation was announced only seven months after the RUG-II method went into effect. Thus, petitioners can hardly contend that they would be prejudiced by application of a new recalibration regulation because of their heavy reliance on the RUG-II methodology in its original form. In fact, for the 1989-1991 rate years, petitioners' Medicaid reimbursement rates were set prospectively on the basis of the RUG-II method as adjusted by the voided prior recalibration regulation. The recalibration regulation under present review merely serves to fill the gap in the process of eliminating the inflationary effects of paper optimization on Medicaid reimbursement rates brought about when the prior recalibration regulation was invalidated (see, Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal, 76 N.Y.2d 325, 330). Finally, the regulation challenged here adopts a cap on recalibration equivalent to the across-the-board 3.035% reduction contained in the former regulation. Thus, petitioners' reimbursement rates will either stay the same or be greater than their rates that were set prospectively for rate years 1989-1991, the only rates for those years upon which petitioners were entitled to rely (see, *275 Matter of Brookdale Hosp. Med. Ctr. v Axelrod, 120 AD2d 144, 147-148, supra). For all the foregoing reasons, the limited retroactive application of the present recalibration regulation is not a sufficient reason to invalidate it (see, Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal, supra; 1 Davis and Pierce, Administrative Law Treatise § 6.6 [3d ed]; 2 Davis and Pierce, op. cit., § 13.2).
We are also unpersuaded by petitioners' alternative contention that the recalibration regulation under review is invalid because it lacks a rational basis and is arbitrary and capricious. As previously discussed, in NYSAC, we held that the prior recalibration regulation's across-the-board 3.035% reduction in nursing home Medicaid reimbursement rates was arbitrary and capricious in two principal respects: (1) the absence of documentation that there was even an average or mean increase of 3.035% in CMI solely attributable to paper optimization and not partly due to increased patient care; and (2) the imposition of an across-the-board percentage reduction, even to facilities that had no increase in CMIs or increases demonstrably attributable to higher levels of patient care. The regulation under review meets both objections. As previously described, the Commissioner has made a strong factual showing of the existence of paper optimization. The Commissioner also rationally identified the existence of four factors capable of producing increases in a facility's CMI: (1) changes in the composition of its patient population because of new admissions; (2) changes in the composition of its patient population because of death or discharge of patients; (3) changes in the conditions or care needs of its patients; and (4) paper optimization. In order to isolate the increase in CMI of each facility solely attributable to paper optimization, the regulation's methodology restricts the data base to that facility's patients who were in residence throughout the entire 1985-1988 period of scrutiny. Thus, the regulation's methodology effectively excludes from the equation CMI increases attributable to changes in the composition of the facility's patient population from new admissions or death or discharge of patients. Petitioners have failed to demonstrate that it was unreasonable for the Commissioner to select the length of stay of a facility's patients as a measurement of changes in CMI due to the remaining legitimate cause of such increases, each patient's deterioration over time. Finally, there were valid reasons for using 1985 State-wide CMI patient averages for the various *276 categories of lengths of patients' stay as a benchmark for comparison to the CMIs of patients of the individual facility being surveyed. As previously explained, the 1985 State-wide CMIs for the various categories of length of stay would have had the least likelihood of inflation due to paper optimization. Moreover, a given facility might not have had a sufficient number of patients in each length of stay category in 1985 to furnish a reliable CMI standard for any given length of stay period. Thus, the instant recalibration regulation focuses on the CMI data of the individual facility and employs a reasonable method of identifying that portion of that facility's CMI increases resulting from paper optimization, by eliminating increases in the CMIs of that facility legitimately caused by changes in the service needs of the facility's patient population. While petitioners have pointed to possible statistical imperfections in the regulation's methodology, they have not met their heavy burden of making a compelling showing of its irrationality or lack of any factual basis (see, Matter of Catholic Med. Ctr. v Department of Health, 48 N.Y.2d 967, 968; Matter of Sigety v Ingraham, 29 N.Y.2d 110, 114), a conclusion supported by their failure to suggest any feasible alternative method to address the problem of paper optimization.
Finally, we also disagree with the majority's conclusion that the Commissioner interpreted his own regulations irrationally in determining the patient days of care of petitioner Jewish Home and Infirmary of Rochester, New York, Inc. (Jewish Home) for purposes of its reimbursement calculations. When Jewish Home commenced operations in 1985, it initially received a budget based rate pursuant to 10 NYCRR 86-2.15, due to its lack of adequate cost experience to receive a cost based rate. Pursuant to former 10 NYCRR 86-2.2 (e), Jewish Home submitted a cost report for August 1, 1985 through January 31, 1986  the first six-month period in which it had an over-all average utilization of at least 90% of bed capacity  which became the basis for calculating its rates on a cost basis.[4] In this cost report, Jewish Home reported a 99.6% occupancy rate for its SNF beds and an 82% occupancy rate for its HRF beds, for an over-all rate of 91.1%. Because Jewish Home's reported SNF occupancy rate exceeded 90%, its SNF reimbursement rate was calculated by the Department of *277 Health based upon the actual number of SNF patient days of care provided at the facility. Since Jewish Home's reported HRF occupancy rate was less than 90%, however, the Department imputed a 90% occupancy rate for purposes of computing its HRF rates.
It is elemental that a commissioner's interpretation of a regulation is "controlling and will not be disturbed in the absence of weighty reasons" (Matter of Sigety v Ingraham, 29 N.Y.2d 110, 114, supra). We review only to assess whether the administrative determination is arbitrary and capricious; if it is not, it must be sustained (see, Matter of Cortlandt Nursing Care Ctr. v Whalen, 46 N.Y.2d 979, 980, supra). In light of this narrow standard of review, we are unable to conclude that the Commissioner's interpretation of the pertinent regulations to treat Jewish Home as a single facility for the purpose of determining when it should file its six-month cost report and then subdividing the facility into its SNF and HRF component parts to determine its patient days of care for reimbursement calculations is arbitrary or capricious.
We have previously sustained as rational the Commissioner's determination to subdivide a facility into its SNF and HRF component parts for rate-setting purposes, due to the differing operational costs and services provided by each (Matter of Cortlandt Nursing Care Ctr. v Whalen, supra, at 980-981). Thus, we should likewise sustain the subdivision here unless the specific regulatory scheme concerning calculation of the residential health care facility days renders that determination irrational.
In finding a lack of rational basis for the Commissioner's interpretation, the majority and the Appellate Division below place emphasis on section 86-2.2 (e)'s benchmark of "an overall average utilization of at least 90 percent of bed capacity" for assessing when a cost report must be filed by a new facility, and import that section's "overall average utilization" language into section 86-2.8 (c)'s patient days determination. However, section 86-2.8 (c) makes no reference to "overall average utilization" at the facility, but rather provides that residential health care facility days are to be determined "by using the higher of the minimum utilization factor of 90 percent of certified beds or the actual patient days of care as furnished by the facility". As only section 86-2.8 (c) specifically addresses the determination of residential health care facility days, section 86-2.2 (e)'s reference to "overall average utilization" *278 does not preclude the Commissioner's challenged interpretation of section 86-2.8 (c) here if it is otherwise rational.
In our view, the Commissioner has proffered a rational basis for treating Jewish Home as a single facility for purposes of determining when it should file its cost report under section 86-2.2 (e) and then segmenting the facility for the patient days calculations under section 86-2.8 (c). There is a strong reason to require a nursing home facility to be entirely budget based or entirely cost based; i.e., to permit one component of a facility to be budget based and the other cost based would allow the facility to manipulate its reimbursement by allocating more costs to the component operating on a cost basis, or by manipulating occupancy so that a component can continue on a budget based rate when a cost based rate may be lower. Accordingly, to prevent such manipulation, section 86-2.2 (e) provides that a facility must switch entirely to a cost based rate when its over-all occupancy is at least 90%.
However, once the facility is being reimbursed on a cost basis, it is rational to apply separate minimum utilization factors to its SNF and HRF components. As previously noted, all reimbursement rate determinations are subject to the overriding statutory requirement that such rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" (Public Health Law § 2807 [3]). Surely it is rational for the Commissioner to proceed on the premise that a facility with an unduly low occupancy rate in either its SNF or HRF beds is not conducting an efficient and economic operation, because the fixed costs of that facility's operation will be distributed over fewer days of care. Moreover, since the rates determined utilizing the submitted cost report provide the basis for all future rates, use of the 82% HRF occupancy level would have incorporated that inefficiency into all of Jewish Home's future HRF rates. Accordingly, when the data furnished by petitioner revealed that Jewish Home's HRF occupancy level was at 82%  a figure comparing poorly with the State-wide average occupancy  the Commissioner was within his authority of rationally based regulatory interpretation to impute the alternative minimum utilization factor of 90% to the HRF component of petitioner's facility. That this construction may not be the only plausible one does not render it subject to judicial nullification if it is compatible with the language of the regulation and not otherwise arbitrary and capricious (Matter of Cortlandt Nursing Care Ctr. v Whalen, supra, at 980).
*279 Accordingly, in both Matter of New York Assn. of Homes & Servs. for Aging v Commissioner of N. Y. State Dept. of Health and Matter of Jewish Home & Infirmary of Rochester v Commissioner of N. Y. State Dept. of Health, we would reverse the order of the Appellate Division and dismiss the petition.
In each case: Order affirmed, with costs.
NOTES
[1] For the subsequent history of NYSAC, see, 191 AD2d 932, lv dismissed 82 N.Y.2d 705, lv denied by App Div, Aug. 11, 1993.
[2] According to DOH's brief, "[t]he 1987 and 1988 rates were recalculated with no recalibration adjustment for nursing homes that had timely challenged the former regulation".
[3] The Appellate Division in Jewish Home modified the Supreme Court's determination by dismissing as time-barred petitioner's challenge to the application of the new recalibration rate to the years 1987 and 1988. That aspect of the Appellate Division's decision is not at issue in this appeal.
[4] Contrary to the dissent's assertion, our analysis and holding is not in any way based on our reading of this Court's decision in NYSAC (78 N.Y.2d 158, supra). In fact, we conclude, as the dissenters apparently do, that neither the holding nor the underlying judgment that we affirmed in NYSAC resolves the issue before us.
[5] Similarly flawed is the dissent's effort to justify its conclusion by distinguishing between a "preexisting, approved facility reimbursement rate and a preexisting rate-making methodology" (dissenting opn, at 269) for purposes of applying Public Health Law § 2807 (7) (a). The distinction is artificial, since rates and the methodologies by which they are reached are inextricably intertwined. A methodology is simply the route by which the rate is reached, and where the methodology is established the rate amount necessarily follows. The artificiality of the distinction the dissent draws is particularly apparent here, where the invalidated regulation imposed an across-the-board 3.035% reduction on the rates the nursing homes would otherwise have received. Under those circumstances, it defies reality to suggest, as the dissent does, that after the invalidation of the initial recalibration regulation "there were no preexisting, prospectively set reimbursement rates which could have been reinstated." (Dissenting opn, at 270.) The "pre-existing" reimbursement rate is easily identified: it is the rate that was to be used to calculate the 3.035% reduction. Indeed, the existence and vitality of that preexisting rate is evident from the postjudgment litigation in NYSAC, which the dissent cites. Following our Court's decision in NYSAC (78 N.Y.2d 158, supra), the successful plaintiff in that case made a motion to enforce its judgment, contending that DOH was precluded thereby from attempting to enforce its new recalibration rate retroactively against it. The Appellate Division, as well as the trial court that issued the judgment, agreed and found no difficulty in simply directing DOH to authorize payment after adding onto the base rate the 3.035% that had improperly been deducted (see, 191 AD2d 932).
[6] Notably, the United States Supreme Court has declined to adopt a virtually identical argument in connection with the Federal analogue of Public Health Law § 2807 (7) (a) (Bowen v Georgetown Univ. Hosp., 488 US 204, 213-215).
[1] By contrast, in the postjudgment litigation in NYSAC (see, 191 AD2d 932, lv dismissed 82 N.Y.2d 705, lv denied by App Div, Aug. 11, 1993), the Commissioner was ordered to "recalculate the Medicaid reimbursement rates for plaintiff's member nursing homes for the period from January 1, 1989 through December 31, 1991 so as to include an additional 3.035% in the direct component of said rates" (emphasis supplied).
[2] Petitioner New York Association of Homes and Services for the Aging, Inc. is a not-for-profit organization whose membership includes 264 nursing homes, all of which are owned and operated by either charitable providers or county governments. Its member nursing homes will also be referred to hereinafter as petitioners.
[3] The order in the postjudgment NYSAC litigation, quoted at footnote 1, supra, is inconsistent with the prevailing view.
[4] By amendment effective March 26, 1993, section 86-2.2 (e) now provides that a cost report must be filed by a new facility for the first 12-month period in which it has an over-all average utilization of at least 90% of bed capacity.