83 N.Y.2d 156 (1993)
630 N.E.2d 626
608 N.Y.S.2d 930
Rent Stabilization Association of New York City, Inc., et al., Appellants, and Small Property Owners of New York, Intervenor-Appellant,
v.
Richard L. Higgins, as Commissioner of the New York State Division of Housing and Community Renewal, Respondent, and Robert Wells et al., Intervenors-Respondents.
Court of Appeals of the State of New York.
Argued November 16, 1993.
Decided December 21, 1993.
Belkin Burden Wenig & Goldman, New York City (Sherwin Belkin, Martin J. Heistein and Magda L. Cruz of counsel), for appellants.
Ronald D. Hariri & Associates, P. C., New York City (Ronald D. Hariri of counsel), for intervenor-appellant.
Cullen S. McVoy, Dennis J. Saffran, Daniel E. Konig, Bronx, and Robert Abrams, Attorney-General, New York City (Jerry Boone and Harvey M. Berman of counsel), for respondent.
Paris R. Baldacci, New York City, Jean T. Schneider, Jane E. Booth, Sandra R. Farber, Ruth E. Harlow, Beatrice Dohrn, Martin L. Price, Brooklyn, Diane Lutwak, Frank J. Barbaro and Melissa Cook for intervenors-respondents.
O. Peter Sherwood, Corporation Counsel of New York City (Jane S. Earle and Leonard Koerner of counsel), for City of New York, amicus curiae.
Rosenberg & Estis, P. C., New York City (Gary M. Rosenberg and Jeffrey Turkel of counsel), for Community Housing Improvement Program, Inc., amicus curiae.
Kleo J. King, Jackson Heights, Jody Leight, Valerie Bogart, Nancy Morawetz, New York City, and Abby Abinante, of the California Bar, admitted pro hac vice, for Eastern Paralyzed Veterans Association and others, amici curiae.
Ronald A. Zumbrun, James S. Burling and R. S. Radford, of the California Bar, admitted pro hac vice, and Klein & Keenan, Yonkers (Carol S. Keenan of counsel), for Pacific Legal Foundation, amicus curiae.
Carb, Luria, Glassner, Cook & Kufeld, New York City (Sydney A. Luria, Stephen J. Fallis and James E. Schwartz of counsel), for The Real Estate Board of New York, amicus curiae.
Himmelstein, McConnell & Gribben, New York City (William Gribben, Kevin R. McConnell and Samuel J. Himmelstein of counsel), for New York State Tenant and Neighborhood Coalition Inc. and others, amici curiae.
Judges SIMONS, TITONE, HANCOCK, JR., BELLACOSA and LEVINE concur with Chief Judge KAYE; Judge BELLACOSA concurs in a separate opinion; Judge SMITH taking no part.
*164 Chief Judge KAYE.
Essentially two challenges are mounted by appellant property owners to regulations promulgated by respondent Division of Housing and Community Renewal (DHCR) enlarging the class of "family members" entitled to succeed to a rent-regulated apartment on the death or departure of the tenant of record. As did the Appellate Division, we conclude first that the regulations are within the agency's rule-making authority, and second that no unconstitutional "taking" was effected.

I.
We begin with the background of the challenged regulations. In response to what was found to be a severe housing shortage following World War II, the legislature enacted laws *165 providing for rent control and, later, rent stabilization.[1] Perceiving that continuing need throughout the ensuing decades, the legislature has periodically extended rent regulation to the present day, most recently providing for deregulation only of apartments with monthly rents in excess of $2,000 (see, Rent Regulation Reform Act of 1993, L 1993, ch 253 [extending rent control and rent stabilization until June 15, 1997]).
The legislature in 1983 designated DHCR "the sole administrative agency to administer the regulation of residential rents" under the rent control and rent stabilization statutes (Omnibus Housing Act, L 1983, ch 403, § 3), and in 1985 additionally granted DHCR authority to amend the Rent Stabilization Code (a body of regulations previously administered by a private association of property owners) (see, L 1985, ch 888, § 2).
The rent control statutes accorded noneviction protection to a "tenant," meaning that the tenant had the right to remain after expiration of the original tenancy (see, McKinney's Uncons Laws of NY § 8585 [1] [Emergency Housing Rent Control Law § 5 (1)] [1946]; Administrative Code § 26-408 [a], formerly § Y51-6.0 [1962]). In the event of the tenant's death, the rent control regulations promulgated under the statutes additionally prohibited eviction of the surviving spouse or a family member who had been living with the tenant (see, 9 NYCRR 2104.6 [d] [1964]; 2204.6 [d] [1984]). That protection was later extended to family members living with a tenant who voluntarily vacated the apartment (see, Matter of Herzog v Joy, 74 AD2d 372, 376, affd 53 N.Y.2d 821).
The rent stabilization statute required that a renewal lease be offered to a "tenant" (see, Administrative Code former § YY51-6.0 [c] [4] [1969]), but nothing in the regulations elaborated upon the statutory language. Thus, unlike rent control, under rent stabilization only the tenant of record was entitled to a renewal lease (see, Sullivan v Brevard Assocs., 66 N.Y.2d 489, 493). In 1987, however, DHCR amended the rent stabilization regulations to provide noneviction protection to "family *166 member[s]," a term defined in the Code to include 24 specified blood-or-marriage relationships (see, 9 NYCRR 2520.6 [o] [1987]). Where the tenant of record died, family members who had resided in the unit for at least two years (one year if the tenant was elderly or disabled) were entitled to succeed to the tenancy; where the tenant of record voluntarily vacated the apartment, family members who had resided in the unit from the inception of the tenancy or commencement of the relationship were entitled to succeed to the tenancy (see, 9 NYCRR 2523.5 [b] [1987]).
DHCR's amendments to the Rent Stabilization Code were sustained by the Appellate Division as an appropriate exercise of the agency's authority (see, Festa v Leshen, 145 AD2d 49) and are not challenged on the present appeal.
This Court in 1989 determined that "family member" as used in the rent control regulations included the life partner of a deceased tenant who had resided with the tenant for many years in a familial-type relationship (see, Braschi v Stahl Assocs. Co., 74 N.Y.2d 201, 211; see also, East 10th St. Assocs. v Estate of Goldstein, 154 AD2d 142 [extending holding in Braschi to rent stabilization regulations]). Months later, DHCR promulgated the regulations at issue on this appeal.

II.
The regulations were first issued by DHCR on November 8, 1989 as emergency regulations extending noneviction protection to qualified family members of a tenant of record in all rent-regulated housing where the tenant vacated the unit. The regulations were made permanent on March 20, 1990 after public hearings and became effective April 4, 1990.[2]
The regulations enlarged the definition of "family member," beyond blood or marriage, to include:
"Any other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person *167 and the tenant or permanent tenant. Although no single factor shall be solely determinative, evidence which is to be considered in determining whether such emotional and financial commitment and interdependence existed, may include, without limitation, such factors as listed below. In no event would evidence of a sexual relationship between such persons be required or considered."
The specified relevant factors are (i) longevity of the relationship; (ii) whether the parties share household expenses; (iii) intermingling of finances; (iv) whether they engage in family-type activities; (v) whether they have formalized legal obligations toward each other; (vi) whether they hold themselves out as family members; (vii) whether they regularly perform family functions; and (viii) any other pattern of behavior that evidences an intention to create a long-term, emotionally committed relationship. The amendments extend noneviction protection uniformly to family members whether the tenant dies or vacates voluntarily, so long as the family member has resided in the apartment for two years (one year where the tenant is elderly or disabled), or has resided with the tenant from the inception of the tenancy or the commencement of the relationship.
As the grounds for its action, DHCR specified New York's chronic low rental vacancy rate for affordable units, increasing homelessness and poverty, the AIDS epidemic and the rise in nontraditional families (including same-sex couples, de facto marriages, single parent households and other living arrangements no longer exceptional). The regulations, according to DHCR, were "intended to clarify a non-traditional family member's right to remain in his or her home, particularly at a time when a significant percentage of these households may be vulnerable to the AIDS epidemic." In extending the protection to all qualified family members regardless of the reason for the tenant's permanent departure, DHCR claimed that it redressed a situation that in its experience had led to illogical and unjust results.
In releasing the regulations, DHCR stated that New York's crisis in affordable housing posed an immediate threat requiring emergency regulations because, with tenants dying or vacating apartments daily, landlords and remaining occupants needed guidance and some measure of consistency in determining who would be permitted to remain in rent-regulated *168 housing and who could be evicted. In assessing the added burden on property owners, DHCR concluded that the average building's rent rolls would be reduced by .045% due to fewer regulated apartments subject to a vacancy increase in any given year. DHCR further found the effect of the regulations directly proportional to the number of units owned, thus concluding that small property owners would not be disproportionately affected. Finally, DHCR noted that an owner's right to collect the regulated rent and evict undesirable tenants would be unaffected by the new regulations.
Appellants sought a preliminary injunction and a declaration that the new regulations were unconstitutional and invalid, and Supreme Court temporarily restrained their implementation; the Appellate Division, however, deeming the TRO a preliminary injunction, reversed and vacated the restraint (164 AD2d 283). After Supreme Court granted respondents' cross motions for a declaration that the regulations were within the proper exercise of DHCR's authority, appellants sought a direct appeal to this Court, which we transferred to the Appellate Division on the ground that questions other than the constitutional validity of a statute were involved (see, CPLR 5601 [b] [2]). The Appellate Division upheld the regulations as a valid exercise of DHCR's authority for the reasons set forth in its opinion vacating the preliminary injunction, adding that the regulations substantially advance a legitimate governmental interest under the most recent United States Supreme Court opinions addressing regulatory takings (see, Lucas v South Carolina Coastal Council, 505 US ___, 112 S Ct 2886; Yee v Escondido, 503 US ___, 112 S Ct 1522). Because a substantial constitutional question is directly presented, appeal to this Court lies as of right (see, CPLR 5601 [b] [1]).

III.
We first address appellants' assertion that DHCR was without authority to adopt the challenged regulations.
Appellants recognize that the legislature has provided DHCR a broad mandate to promulgate regulations in furtherance of the rent control and rent stabilization laws that will "`inevitably require some changes in the legal relationship between landlords and tenants'" (see, Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal, 76 N.Y.2d 325, 328-329, rearg denied 76 N.Y.2d 890),[3] *169 and indeed do not challenge earlier regulations providing for family succession to rent-regulated housing. They urge, however, that with the most recent regulations, DHCR has overstepped its mandate and invaded the province of the legislature, in violation of the constitutional separation of powers.
As an arm of the executive branch of government, an administrative agency may not, in the exercise of rule-making authority, engage in broad-based public policy determinations (see, Boreali v Axelrod, 71 N.Y.2d 1, 9). In Boreali, we concluded that the difficult-to-demarcate line between administrative rulemaking and legislative policymaking had been transgressed, and invalidated regulations promulgated by the Public Health Council prohibiting indoor smoking in specified public areas on the ground that the regulatory scheme was improperly based upon policy considerations originating with the agency and not the legislature. We identified four "coalescing circumstances" indicating that the agency, in enacting the regulations, had usurped the role of the legislature in making public policy assessments.
First, the agency created exemptions from the smoking ban for particular indoor areas, such as trade shows, conventions and bars, or upon a showing of financial hardship, from which we concluded that the agency had improperly weighed competing health and public policy concerns. Exempting certain indoor areas from these regulations required consideration not of health concerns  the agency's proper focus  but of competing social and political issues. Second, the agency enacted the smoking ban on a clean slate, exceeding its proper role of merely filling the interstices of a legislative mandate. Third, the legislature itself had repeatedly failed to reach agreement on indoor smoking, suggesting that the subject was one that required resolution of competing policy interests. Finally, the regulatory scheme  "a simple code describing the locales in which smoking would be prohibited and providing exemptions *170 for various special interest groups"  did not require the agency's particular competence in the field of public health (71 NY2d, at 14).
Such circumstances are not present in this case. Rather, in defining the persons to be afforded noneviction protection in an ongoing housing crisis, DHCR has acted within its competence and authority (see, Matter of Consolidated Edison Co. v Department of Envtl. Conservation, 71 N.Y.2d 186, 191-192; Matter of Nicholas v Kahn, 47 N.Y.2d 24, 31).
Most significantly, DHCR has not acted on a clean slate  noneviction protection in rent-regulated housing was first created by the legislature in the rent control and rent stabilization laws (see, McKinney's Uncons Laws of NY § 8585 [1] [Emergency Housing Rent Control Law § 5 (1)]; Administrative Code § 26-408 [a]; § 26-511 [c] [4]). This protection has in the past been enlarged by the agency, after which the legislature has voted to extend rent regulation without modifying those provisions.
The challenged regulations "`fill in the interstices'" of the legislative mandate (see, Versailles Realty, 76 NY2d, at 329) by redefining the protected class of people to include those who, in DHCR's experience as sole administrator of residential rent regulation and adjudicator of eviction disputes, are most in need of protection against loss of their homes in a continuing housing emergency. Adjustment of the existing scheme in light of the agency's technical competence is well within the proper rule-making function of this agency. Moreover, unlike the Public Health Council in Boreali, DHCR has not enacted categorical exemptions reflecting accommodations to special interest groups.
Finally, although appellants point to 27 bills introduced in the legislature between 1986 and 1989 relating to succession rights, the legislature has not sought to alter succession rights in the years following DHCR's emergency and later permanent regulations (see also, Festa, 145 AD2d, at 63). Of particular significance is the fact that the legislature this year made substantial reforms in rent regulation, including deregulation of luxury units, without addressing noneviction protection (see, Rent Regulation Reform Act of 1993, L 1993, ch 253). We cannot agree with appellants that, in these circumstances, the failed bills alone warrant the conclusion that the agency has exceeded its mandate (see also, Boreali, 71 NY2d, at 11).
Thus, we reject appellants' contention that DHCR acted beyond its authority.

*171 IV.
Appellants next urge that the challenged regulations are unconstitutional on their face because, without just compensation, they require owners of rent-regulated housing to suffer a permanent physical occupation of their property; deprive them of the beneficial use of their property; and fail to substantially advance a legitimate governmental objective (see, NY Const, art I, § 7 [a]; US Const 5th Amend).
This appeal does not put before us the question whether rent regulation itself constitutes a taking  a question that has excited recent scholarly interest (see, e.g., Radford, Regulatory Takings Law in the 1990's: The Death of Rent Control?, 21 Sw U L Rev 1019 [1992]; Note, Bright Lines in the Big City: Seawall, Tenant Succession Rights, and the Jurisprudence of Takings, 91 Colum L Rev 609 [1991]; but see, Pennell v San Jose, 485 US 1, 12, n 6; Block v Hirsh, 256 US 135, 156; Loab Estates v Druhe, 300 N.Y. 176, 180). Appellants challenge only the recent family-succession amendments to the rent control and rent stabilization regulations. We note, further, that in this facial challenge, appellants bear the heavy burden of overcoming the presumption of constitutionality that attaches to the challenged enactments (see, e.g., de St. Aubin v Flacke, 68 N.Y.2d 66, 76; Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 440). Appellants have failed to sustain that burden.
A. Physical Occupation
Governmental action that compels an owner to endure a permanent physical occupation of its property effects an unconstitutional taking per se (see, Yee, 503 US, at ___, 112 S Ct, at 1526; Loretto, 458 US, at 434-435). Appellants claim that they are forced by the new regulations to accept strangers as tenants and that these tenancies, no longer restricted to blood-or-marriage relatives of the original tenant, will exist in perpetuity. Because the coresidency requirement in the case of a tenant who voluntarily vacates has been reduced to the shorter of two years (one year in the case of elderly or disabled tenants) or the inception of the tenancy or commencement of the relationship, appellants further complain that the new regulations make it easier to qualify for protection.
At the outset, we are unpersuaded by the argument that the new regulations have created perpetual tenancies. An *172 owner's right to evict an unsatisfactory tenant or convert rent-regulated property to other uses remains unaffected (see, 9 NYCRR parts 2104, 2204, 2504, 2524; Yee, 503 US, at ___, 112 S Ct, at 1528-1529). That a rent-regulated tenancy might itself be of indefinite duration  as has long been the case under rent control and rent stabilization  does not, without more, render it a permanent physical occupation of property (see, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 991-993 [1989]).
Nor does the fact that an owner must offer a renewal lease to a departed tenant's newly defined family member  potentially a stranger to the owner  give rise to such a physical occupation (see, Yee, 503 US, at ___, 112 S Ct, at 1528). In Seawall Assocs. v City of New York (74 N.Y.2d 92, 105, cert denied 493 US 976), we held that Local Law No. 9 of 1987, which required owners of single room occupancy housing accommodations to rehabilitate and rent out their units, forcing them "to subject their properties to a use which they neither planned nor desired," constituted a physical taking per se. By contrast, in Yee, the Supreme Court held that requiring owners of mobile home parks to rent the "pad" beneath a mobile home at controlled rents to any purchaser of the mobile home did not constitute a physical occupation because the owners had "voluntarily open[ed] their property to occupation by others" and thus could not "assert a per se right to compensation based on their inability to exclude particular individuals" (Yee, 503 US, at ___, 112 S Ct, at 1530).
The difference  dispositive here  between requiring an owner to accept a purported stranger as a tenant and compelling the owner to rent out single room occupancy accommodations is in the owner's voluntary acquiescence in the use of its property for rental housing (see, Yee, 503 US, at ___, 112 S Ct, at 1531; Federal Communications Commn. v Florida Power Corp., 480 US 245, 252-253; see also, Seawall, 74 NY2d, at 105). As we noted in Seawall, "[i]t is the forced occupation[,] * * * not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings" (Seawall, 74 NY2d, at 106). Indeed, once a property owner decides to rent to tenants, the antidiscrimination laws eliminate an owner's unfettered discretion in rejecting tenants (see, Yee, 503 US, at ___, 112 S Ct, at 1530; see also, Atlanta Motel v United States, 379 US 241; Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 997-998).
*173 In any event, a "family member" for noneviction purposes, applying all of the criteria established by DHCR, is no more likely to be a stranger to the owner than a family member as formerly defined. This is so because, under either definition, the family member entitled to noneviction protection must have occupied the apartment with the tenant of record in a long-term, committed relationship (to be determined on a case-by-case basis in accordance with the specified criteria). In fact, the challenged regulations additionally permit the owner to request, when offering a renewal lease, the names of all co-occupants and whether they qualify as family members (9 NYCRR 2104.6 [d] [2]; 2204.6 [d] [2]; 2503.5 [e]; 2523.5 [e]).
Because the challenged regulations may require the owner-lessor to accept a new occupant but not a new use of its rent-regulated property, we conclude that appellants have failed to establish their claim that, facially, a permanent physical occupation of appellants' property has been effected.
B. Regulatory Taking
As an alternative facial challenge, appellants urge that the regulations effect an impermissible regulatory taking, which occurs when governmental action forces some people alone to bear burdens that, in fairness, ought to be borne by society at large (see, Seawall, 74 NY2d, at 107). Regulation of private property constitutes an unconstitutional taking if it denies an owner economically viable use of the property (a per se regulatory taking), or if it does not substantially advance legitimate State interests (Seawall, 74 NY2d, at 107; Lucas, 505 US, at ___, 112 S Ct, at 2893; Nollan v California Coastal Commn., 483 US 825, 834).
Appellants claim, first, that the new regulations deprive them of both the benefit of rental increases that occur upon vacancy and the reversionary interest in their property. However, a regulation effects a per se regulatory taking only in the relatively rare situation where "the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave [the] property economically idle" (Lucas, 505 US, at ___, 112 S Ct, at 2895). Here, the regulations do not affect the owner's right to receive the regulated rents, unchallenged as a reasonable return. Moreover, because the tenancies are not perpetual (as discussed above), the owners are not deprived of their reversionary interest (compare, 520 E. 81st St. Assocs. v Lenox Hill Hosp., 157 AD2d 138, 150, revd on other grounds 77 N.Y.2d 944). *174 We thus conclude that the owners have not met their burden of showing the requisite deprivation of economically beneficial use of their property (see, Lucas, 505 US, at ___, n 6, 112 S Ct, at 2893, n 6).
Alternatively, appellants maintain that DHCR has failed to demonstrate the challenged regulations substantially advance the concededly legitimate governmental objectives of prevention of unwarranted evictions and alleviation of homelessness (see, Seawall, 74 NY2d, at 111). The absence of a close causal nexus between a regulated use of the property and the problem sought to be ameliorated may invalidate a regulation (see, Nollan, 483 US, at 837). The owners insist that rent regulation perpetuates rather than alleviates the housing shortage in New York, citing evidence that, faced with a lower over-all return from a building, owners will invest less in repairs, hastening the building's deterioration.
The question before us, however, is not the general wisdom or desirability of present rent regulation (the statutes and regulations combined) to address the State's housing situation  that is a question for the legislature. Rather, the question we decide is whether there is a close causal nexus between the challenged regulations and the stated purpose of preventing the eviction and resulting vulnerability to homelessness of the identified beneficiaries (see, Nollan, 483 US, at 837; Seawall, 74 NY2d, at 112). We agree with the Appellate Division that there is.
People who would, absent the regulations, be threatened with eviction from their homes may now have the right to remain. In Seawall, on the other hand, forcing owners to let single room occupancy accommodations did not substantially advance the City's interest in alleviating homelessness because those units would not necessarily have been rented to homeless or potentially homeless persons (Seawall, 74 NY2d, at 111, 112, n 11). The designation of classes of individuals to whom DHCR has extended noneviction protection  persons deemed by the agency to be threatened with loss of their homes, and therefore in need of such protection  is a matter that falls within the agency's expertise (see, Matter of Teachers Ins. & Annuity Assn. v City of New York, 82 N.Y.2d 35, 40-41).[4]
*175 Thus, we conclude that no unconstitutional taking has been demonstrated.

V.
Appellants' miscellaneous points are without merit. DHCR has complied with the State Administrative Procedure Act: appellants do not dispute that DHCR filed the proposed regulations with the Secretary of State, submitted a notice of adoption for publication in the State Register, issued appropriate regulatory impact statements and other analyses and held a public hearing (see, State Administrative Procedure Act §§ 202, 202-a). Nor do we agree that the regulations are impermissibly vague. The factors to be considered in determining the existence of a qualifying relationship are objective, detailed and specific, and provide ample guidance in identifying the commencement of the relationship despite the absence of a marriage certificate or other legal document. Appellants' remaining contentions are without merit.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
BELLACOSA, J. (concurring).
Chief Judge Kaye's opinion of the Court cogently distinguishes respondents' regulations, challenged on this record, from the respective constitutional limitations on governmental actions found to have been violated in Boreali v Axelrod (71 N.Y.2d 1) and Seawall Assocs. v City of New York (74 N.Y.2d 92, cert denied 493 US 976). I therefore concur and join fully in her opinion. Because I perceive significant practical and governance concerns that merit close attention as an outgrowth of this decision, I add these observations.
In the distribution and delegation of governmental powers, it is quite momentous that any administrative agency should possess the potent public policy power to extend the durational *176 and relational sweep of the plurality rationale of Braschi v Stahl Assocs. Co. (74 N.Y.2d 201), including fully into the rent stabilization category and more widely than was allowed even in the rent control field of that case. The case-by-case application of this judicially approved regulatory initiative adds layers of great sensitivity and breadth to the implementation of this case. However high-purposed, well-intentioned and possessed of special expertise respondents' agency is, the societal equation is delicately weighted with practical, legal and fiscal consequences on all sides. Thus, while I also agree with the Chief Judge's acknowledgement of the primacy of legislative choices in the field (majority opn, at 174), I believe it useful to go farther and urge the Legislature to carefully assess the sweeping power it impliedly invested in this administrative agency in the execution of a unique human sheltering mission.
In a similar cautionary frame of thought with respect to ensuing judicial branch responsibilities, I also believe that as-applied controversies under the challenged regulations, in contradistinction to the facial challenge of this case, will be profound (Seawall Assocs. v City of New York, 74 N.Y.2d 92, supra). Diminution of alienation and value of affected properties, examined under an as-applied microscope, are bound to seriously affect many people, landlords and tenants alike, and the availability of sufficient, appropriate and affordable dwelling places. It would seem that as-applied challenges will inevitably compel courts to examine tenancy sequences in potentially long and somewhat indefinite time lines and relationships. This will be complicated by the substantial administrative, quasi-adjudicative tasks necessarily implicated. It is virtually certain that long, successive successorships to rent-stabilized leaseholds will not be just theoretical possibilities because, markets being markets, they are likely to bloom as perennials, becoming functionally transformed into perpetual stakeholds. The Legislature should satisfy itself, as the courts will have to, that unwarranted de facto results from administrative quasi-judicial determinations do not constitute the functional equivalent of divestitures from landowners of reversionary rights to their properties without just compensation and due process.
Order affirmed, with costs.
NOTES
[1] See, Emergency Housing Rent Control Law (L 1946, ch 274, as amended [rent control outside New York City]); Local Emergency Housing Rent Control Act (L 1962, ch 21, as amended [rent control within New York City]); City Rent and Rehabilitation Law (Administrative Code of City of NY § 26-401 et seq. [rent control within New York City]); Rent Stabilization Law (Administrative Code §§ 26-501 to 26-520, as amended [1969] [rent stabilization within New York City]); and Emergency Tenant Protection Act (L 1974, ch 576, § 4, as amended [rent stabilization outside New York City]).
[2] See, Rent and Eviction Regulations (9 NYCRR 2104.6 [d] [3] [i] [rent control outside New York City]; 2204.6 [d] [3] [i] [rent control within New York City]); Emergency Tenant Protection Regulations (9 NYCRR 2500.2 [n]; 2503.5 [d] [rent stabilization outside New York City]); Rent Stabilization Code (9 NYCRR 2520.6 [o] [2]; 2523.5 [b] [rent stabilization within New York City]).
[3] See, McKinney's Uncons Laws of NY § 8584 (4) (a) (Emergency Housing Rent Control Law § 4 [4] [a]) (DHCR empowered to "adopt, promulgate, amend or rescind such rules, regulations and orders as it may deem necessary or proper to effectuate the purposes of" rent control); Administrative Code § 26-405 (g) (1) (same); McKinney's Uncons Laws of NY § 8630 (Emergency Tenant Protection Act § 10) (DHCR authorized to implement "appropriate" rent stabilization regulations); Administrative Code § 26-511 (c) (1) (DHCR authorized to amend Rent Stabilization Code to "protect[ ] tenants and the public interest").
[4] As we noted in Seawall (74 NY2d, at 107, n 6), examination of the owners' "`reasonable investment backed expectations'" (see, Lucas, 505 US, at ___, n 8, 112 S Ct, at 2895, n 8; Penn Cent. Transp. Co. v New York City, 438 US 104, 124) is not relevant to a facial challenge involving a per se regulatory taking. Were we to examine appellants' expectations in assessing their broader facial challenge, we would conclude in any event that frustration of their asserted "expectation"  that the class of persons entitled to noneviction protection would not be enlarged  is insufficient to satisfy their burden in establishing a taking (see, Penn Cent., 438 US, at 136; see also, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 971).