Levine, J.
(dissenting). I respectfully dissent.
In my view, the majority has mistakenly applied a per se standard to an as-applied, purely regulatory takings claim under the Just Compensation Clause of the Fifth Amendment here. In doing so, the majority disregards plaintiffs’ utter failure to show that they suffered any economic loss to their investment in the New York City residential rentals market as a result of the application of chapter 940 of the Laws of 1984 to their 100-plus units apartment building. This case presents essentially and realistically a takings claim challenge to an economic regulation of a business enterprise and, as such, economic analysis of the impact of the regulation is particularly vital to achieving a just disposition of the case. Chapter 940, which merely restored to New York City nonprofit community hospitals the protection of the Rent Stabilization Law of 1969 (RSL) and the Emergency Tenant Protection Act of 1974 (ETPA) they previously enjoyed, is completely consistent with and directly furthers basic purposes of the RSL and the ETPA and this Court should sustain its validity.
*401 I.
Concededly and indeed as characterized by plaintiffs, the instant action is a challenge under the Just Compensation, or "Takings” Clause of the Fifth Amendment of the United States Constitution to chapter 940 of the Laws of 1984 as applied to their ownership of an apartment building of over 100 units on the Upper East Side of Manhattan, 15 of which are leased to defendant Lenox Hill Hospital. Also, before this Court, plaintiffs have abandoned any claim that the tenant eviction protection restored to Lenox Hill under chapter 940 constitutes a per se, physical taking, that is, statutory authorization for a physical occupation of their property (cf., Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 426; Seawall Assocs. v City of New York, 74 NY2d 92, 102-106). Accordingly, this appeal is limited to an as-applied challenge to an alleged, purely regulatory taking.
In Penn Cent. Transp. Co. v New York City (438 US 104), the Supreme Court articulated the appropriate considerations and method of analysis by courts in reviewing such purely regulatory, as-applied taking challenges. First, the Court emphasized that the Just Compensation Clause, insofar as it extends to a regulatory taking, deals with disproportionate economic burdens unfairly imposed on a comparatively few individuals by government regulation, and that there is no simple litmus test to determine whether a given regulation constitutes a taking. "[T]his Court, quite simply, has been unable to develop any 'set formula’ for determining when 'justice and fairness’ require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons” (id., at 124 [emphasis supplied]). The Court in Penn Cent, cautioned "that government may execute laws or programs that adversely affect recognized economic values” without giving rise to a valid takings claim and that there are other instances where, although "government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property’ for Fifth Amendment purposes” (id., at 124-125 [emphasis supplied]).
Thus, the Court in Penn Cent, directed that judicial review of a claimed as-applied regulatory taking entails "ad hoc, factual inquiries” in which notably important factors to be considered are "[t]he economic impact of the regulation on the *402 claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations” (id., at 124).
The Supreme Court in Penn Cent, also rejected a Takings Clause methodology later described as "conceptual severance”,[1] i.e., the stratagem of dividing a unitary property into its various component physical segments or its various integral property interests and finding a taking because of the challenged regulation’s impact on one physical segment or an individual property right. " 'Taking’ jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole” (id., at 130-131 [emphasis supplied]).
Supreme Court decisions subsequent to Penn Cent, including decisions authored by the Justices most sensitive to the property rights of owners in Takings Clause cases, confirm the continued validity of the Penn Cent, ad hoc analysis in as-applied regulatory taking cases, with its emphasis on identifying the economic factors involved in the taking. Thus, in Hodel v Irving (481 US 704), Justice O’Connor characterized the Penn Cent, approach as a "framework for examining the question whether a regulation of property amounts to a taking requiring just compensation [which] is firmly established and has been regularly and recently reaffirmed” (id., at 713-714). Chief Justice Rehnquist in Pennell v San Jose (485 US 1), declined to entertain a facial regulatory taking challenge to a rent-control ordinance because it was impossible to ascertain the economic impact of the ordinance at that preliminary stage. "Given the 'essentially ad hoc, factual inquir[y]’ involved in the takings analysis * * * the mere fact that a hearing officer is enjoined to consider hardship to the tenant in fixing a landlord’s rent, without any showing in a particular case as to the consequences of that injunction in the ultimate determination of the rent, does not present a sufficiently concrete factual setting for the adjudication of the takings claim appellants raise here” (id., at 10 [emphasis supplied]). And in Lucas v South Carolina Coastal Council *403 (505 US —, 112 S Ct 2886), Justice Scalia again affirmed that in the absence of a per se taking "we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations’ are keenly relevant to takings analysis generally” (505 US, at —, n 8,112 S Ct, at 2895, n 8, supra).
The Supreme Court’s emphasis on inquiring for economic loss in an as-applied regulatory takings claim follows directly from the very language of the Takings Clause itself in the Fifth Amendment, which authorizes all forms of governmental appropriation of private property for a public use, upon the payment of "just compensation” (US Const Fifth Amend). As one scholar has pointed out, the "normative component” of the Takings Clause that "has predominated in modern cases” is the "protection of economic value”[2] (Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 958). This is why "[i]t is the owner’s loss, not the taker’s gain, which is the measure of the value of the property taken” (United States v Causby, 328 US 256, 261; see also, Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 516 [Relinquish Ch. J., dissenting] ["the question (whether a regulatory taking has occurred) is evaluated from the perspective of the property holder’s loss rather than the government’s gain”]).
The centrality of determining the extent of economic loss in a regulatory takings challenge was again stressed in Keystone Bituminous Coal Assn., which held "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property” (supra, at 497). And in Keystone, the Court also insisted that the comparison is to be based upon the economic loss to the property as a whole (id.; accord, Concrete Pipe & Prods. v Construction Laborers Pension Trust, 508 US —, —, 113 S Ct 2264, 2290).
It follows from the foregoing that plaintiffs’ minimum burden in order to establish an as-applied regulatory taking here was to show with a modicum of definiteness that they sustained some significant loss of value in their apartment build *404 ing as a whole because of the application of chapter 940. Indeed, our own precedents require a Takings Clause challenger to show with a high degree of definiteness the loss of value to the affected property caused by a regulatory taking (see, de St. Aubin v Flacke, 68 NY2d 66, 76-77).
In the instant case, the sole evidence submitted by plaintiffs of any adverse economic impact of chapter 940 on the value of their apartment building was the averment of one of the plaintiffs that the statutorily required renewals of the Lenox Hill leases prevented plaintiffs from exercising their vacancy rights under the RSL and ETPA, to "renovate and reconfigure the apartments to increase the fair market value and rent roll of the building”. It was not inadvertent that the only economic evidence of plaintiffs was this vague reference to the possibility of increasing rents and market value of the building through renovations. They concede that if Lenox Hill and its subtenants are evicted, the apartments will remain fully subject to rent stabilization, and any new tenants and their successor family members would enjoy the full protections of the RSL and ETPA for the indefinite future. Moreover, whatever loss in the fair market value of the building caused by plaintiffs’ inability to increase rents through renovations of the 15 apartments leased to Lenox Hill would be offset by the increase in market value attributable to the periodic 15% increases in Lenox Hill’s rents guaranteed under chapter 940.
The other major economic factor mandated for consideration in an as-applied regulatory taking challenge is "the extent to which the regulation has interfered with distinct investment-backed expectations” (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra; see also, e.g., Concrete Pipe & Prods. v Construction Laborers Pension Trust, 508 US —, —, 113 S Ct 2264, 2291, supra; Lucas v South Carolina Coastal Council, 505 US —, —, n 8, 112 S Ct 2886, 2895, n 8, supra; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 493-495, supra). Plaintiffs purchased this apartment building in 1976, some 12 years after Lenox Hill first acquired leases in the building and seven years after the apartments became subject to rent stabilization. Uncontestably, chapter 940 did not create any greater encumbrances upon the apartments leased to Lenox Hill than existed in 1976 when plaintiffs chose to invest in the New York City residential rentals market by acquiring the property. Thus, plaintiffs have totally failed to sustain their burden of establishing that chapter 940 interfered with their investment-backed expectations (see, Con *405 crete Pipe & Prods. v Construction Laborers Pension Trust, 508 US, at —, 113 S Ct, at 2291-2292, supra).
Plaintiffs’ failure to show an economic loss as the result of the application of chapter 940 should be fatal to their challenge. In Goldblatt v Hempstead (369 US 590) the Supreme Court rejected a regulatory taking challenge because "there is no evidence in the present record which even remotely suggests that [enforcement of the regulation] will reduce the value of the lot in question” (id., at 594; see also, PruneYard Shopping Ctr. v Robins, 447 US 74, 84 [Rehnquist, J.] ["(H)ere appellants have failed to demonstrate that the 'right to exclude others’ is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a 'taking’ ”]).
II.
The majority justifies its disregard of plaintiffs’ failure to demonstrate any economic loss as a result of the application of chapter 940 to their apartment building primarily on two grounds. One of those grounds is that, because Lenox Hill is a corporation with "unlimited existence”, chapter 940 permanently deprives plaintiffs of their reversionary interests, and this apparently is viewed as a per se taking. "[E]yen if only a single element of an owner’s 'bundle of [property] rights’ is extinguished, there has been a regulatory taking” (majority opn, at 398). The pertinent Supreme Court decisions hold to the contrary. Plaintiffs voluntarily chose to enter the heavily regulated New York City residential rentals market when they purchased the building in 1976, and they admit that if the Lenox Hill leases are permitted finally to expire, the apartments in question will remain indefinitely in that market. Moreover, despite the application of chapter 940, plaintiffs still continue to be entitled to regain occupancy of any of the apartments from Lenox Hill by establishing that the apartment is intended for use as a primary residence of an owner or the owner’s immediate family (see, 9 NYCRR 2524.4 [a]), or that the owners intend to withdraw the apartment from the rental market (9 NYCRR 2524.5 [a] [1]). Additionally, plaintiffs can terminate any of the Lenox Hill leases and recover possession by showing that Lenox Hill or its subtenants committed any of the statutorily described wrongful acts authorizing an owner to evict (see, 9 NYCRR 2524.3).
The foregoing establishes the virtually identical impairment *406 of reversionary property rights here to that considered by the Supreme Court in Yee v Escondido, (503 US 519). In Yee, the combined State and local mobile home park rent control and tenant eviction control laws imposed municipal regulation of rent increases, limited the park owner’s right to terminate a mobile homeowner’s tenancy to instances of nonpayment of rent and tenant misconduct, or the park owner’s intention to use the park site for an entirely different purpose (see, 503 US, at 524-525, supra). Moreover, the regulations in Yee barred a park owner from disapproving a transfer of ownership of any mobile home in the park or requiring the removal of a mobile home upon its sale. Just as contended here, the taking challengers in Yee asserted that under the legislative scheme "the mobile home owner is effectively a perpetual tenant of the park, and the increase in the mobile home’s value thus represents the right to occupy a pad at below-market rent indefinitely” (503 US, at 527, supra [emphasis supplied]). Not only did the Supreme Court in Yee reject the claimants’ contention that the "perpetual tenancy” constituted a per se physical taking, it also ruled that the challenge to the regulation there fell within the class of cases where determining whether a taking had occurred "entails complex factual assessments of the purposes and economic effects of government actions” (503 US, at 523, supra [emphasis supplied]).
Attaching such critical significance on the takings question to the claimed permanent suspension of plaintiffs’ reversionary rights also is inconsistent with the Supreme Court’s rejection of the "conceptual severance” approach to challenges in Penn Cent. Transp. Co. v New York City (438 US 104, supra) and Keystone Bituminous Coal Assn. v DeBenedictis (480 US 470, supra). As stated in Andrus v Allard (444 US 51): "[W]here an owner possesses a full 'bundle’ of property rights, the destruction of one 'strand’ of the bundle is not a taking, because the aggregate must be viewed in its entirety” (id., at 65-66 [emphasis supplied]).
Elevating the reversionary, noneconomic dominion interest of plaintiffs here to the status of a fundamental constitutional right on the regulatory takings question is, in my view, particularly inappropriate and unrealistic in the case of New York City real estate entrepreneurs in the residential rentals market, in which individual tenants and individual apartments are both highly fungible. In the New York City housing industry, an owner’s genuine reversionary interest is satisfied *407 by the ability to remove a financially or behaviorally irresponsible tenant-rights plaintiffs will continue to enjoy notwithstanding the application of chapter 940.
Scholars and commentators on the Takings Clause have repeatedly pointed out that dominion property interests, that is, the right to exclude others or recover possession, may be of significance to an individual homeowner or even perhaps the lessor of a modest multifamily dwelling, but not for the modern urban real estate entrepreneur’s leasing of a large apartment building where the values at stake in the landlord’s reversionary rights are almost completely economic. Thus, Professor Costonis contrasted the dominion interests identified in William Pitt’s famous illustration of English private property rights, that the most impoverished subject’s weather-beaten cottage remained impregnable to all the King’s forces, with the actual dominion interest of landlords such as plaintiffs.
"But the values comprehended by the dominion interest of Pitt’s 'poorest man’ in his 'ruined tenement’ would seem to be worlds apart from those involved in the dominion interest of a Manhattan landlord, whose apartments are rented for profit to the general public and, when rented, are the subject of their tenants’ exclusive possession.” (Costonis, Presumptive and Per Se Takings: A Decisional Model for the Taking Issue, 58 NYU L Rev 465, 519 [1983]; see also, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 1010-1012; Radin, The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings, 88 Colum L Rev 1667, 1693-1695; Note, The Constitutionality of Rent Control Restrictions on Property Owners’ Dominion Interests, 100 Harv L Rev 1067, 1081-1084 [1987].)
The majority’s principal reason for finding a per se taking here is its conclusion that chapter 940 fails to substantially advance any legitimate State interest because the legislation was enacted purely to serve the private interests of Lenox Hill. The majority also applies a heightened level of judicial scrutiny to the issue of whether chapter 940 advances a legitimate State interest, i.e., requiring a close causal nexus between the legislative means and ends. The majority states that chapter 940 "was sought and designed essentially to *408 subsidize the nonprofit hospital’s special fringe benefit to some of its special health care employees” (majority opn, at 396) and that chapter 940 cannot be characterized as general welfare legislation because it merely serves as a "preservation of this Manhattan Upper East Side housing enclave for this privileged entity’s benefit” (majority opn, at 394). The absence of a close causal nexus is explained as follows: "The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwellings. Chapter 940 does not contribute to that desirable altruistic aim.” (Majority opn, at 395-396 [emphasis supplied].)
Even under the heightened judicial scrutiny standard applied by the majority, a court is not permitted to pick and choose among the express purposes of legislation in employing the test of whether the requisite connection exists between the particular regulation and the problems the Legislature sought to ameliorate. Nor does strict scrutiny require that a regulation serve all of the legitimate State interests the Legislature sought to advance by the statutory scheme.
Undeniably, at least one of the original primary purposes of the rent stabilization laws was "to prevent speculative, unwarranted and abnormal increases in rents” and "to forestall [landlord] profiteering, speculation and other disruptive practices” (Findings and Declaration of Emergency, Local Laws, 1969, No. 16 of City of New York, now codified at Administrative Code of City of NY § 26-501). The tenant eviction protection provisions of the RSL and ETPA not only have the purpose of ameliorating harmful dislocations of tenants (as alluded to in the majority’s opinion), but also serve as a necessary element of any effective rent-regulation program. As recognized by Justice Holmes in Block v Hirsh (256 US 135), the first Supreme Court Takings Clause review of rent control and tenant eviction protection legislation: "The preference given to the tenant in possession is an almost necessary incident of the policy [to prevent excessive rents] and is traditional in English law. If the tenant remained subject to the landlord’s power to evict, the attempt to limit the landlord’s demands would fail” (id., at 157-158 [emphasis supplied]). The Supreme Court again appreciated the need for tenant eviction protection to have effective rent regulation in construing Federal price control legislation a generation later. "The Emergency Price Control Act was intended in part to prevent excessive rents in the public interest, and the very anti-eviction regulations under which the Administrator *409 granted the eviction certificate here were specifically designed to prevent manipulative renting practices which would result in excessive rents” (Parker v Fleming, 329 US 531, 536-537 [emphasis supplied]).
Presumably because corporate primary tenants renting apartments for residential occupancy of officers or staff (such as Lenox Hill has done here) were also subject to the legislatively defined evil of "speculative, unwarranted and abnormal increases in rents”, the Legislature in enacting the RSL in 1969 did not exempt corporate tenancies from the rent regulation and tenant eviction protection benefits of that statute. Hospital and other corporate tenants remained eligible for those benefits until the enactment of the Omnibus Housing Act (OHA) of 1983 (L 1983, ch 403) (see, Koenig v Jewish Child Care Assn., 67 NY2d 955; see also, 520 E. 81st St. Assocs. v Lenox Hill Hosp., 38 NY2d 525). As Judge Ciparick has cogently pointed out in her dissent, the loss of the protections of the RSL and ETPA by nonprofit hospitals was "an unintended consequence of the OHA.” (Ciparick, J., dissenting opn, at 415.) The relevant purpose of the OHA in requiring that the tenant on the primary lease be the occupant of any rent-stabilized apartment was to forestall victimization of subtenants by " 'speculative and profiteering practices’ ” of the primary tenants (Ciparick, J., dissenting opn, at 415 [quoting L 1983, ch 403, § 1]).
As the Bill Jacket to chapter 940 demonstrates, the Legislature could readily have considered that the evils addressed by the primary tenant residency requirements of the OHA were totally inapplicable to the nonprofit community hospitals’ subletting of nearby apartments to nursing staff "with a portion of the rent being subsidized by the Hospital” (Letter from Lenox Hill Hospital, dated July 17, 1984, Bill Jacket, L 1984, ch 940, at 24). The Legislature also could readily have determined that nonprofit hospitals continued to need the protections of the RSL and ETPA. The very same housing market conditions that impelled the original adoption of rent stabilization — apartment scarcity and artificially inflated rents —created a crisis for the hospitals by jeopardizing their ability to maintain adequate staffing. "The high cost of housing and the shortage of available apartments in Manhattan has created the need for the Hospital to provide adequate and moderately priced housing in order to recruit and retain registered nurses” (Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 27).
*410 Moreover, contrary to the assumption of the majority, the crisis was not unique to Lenox Hill Hospital. Mailgrams from the president, director of nursing and general medical director of Beth Israel Medical Center urging the Governor’s approval of chapter 940 state:
"This legislation is essential to hospitals that rent apartments for use by affiliated health care personnel such as nurses. Failure to sign this legislation will make it impossble [sic] for us to provide safe and affordable housing for staff members. The inability to secure such housing seriously compromises our ability to service our community’s health care needs” (id., at 35-37).
There is nothing in the record or legislative history to impugn the representation by Lenox Hill that enactment of the provisions of chapter 940 was "actively sought” by the Association of Hospital Housing Administrators, a group representing 20 nonprofit hospitals in Metropolitan New York (Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 29).
The Legislature therefore could have concluded that removing the protections of the RSL and the ETPA from New York City’s nonprofit hospitals placed the hospitals in the plight of being unable to maintain adequate nursing staff because of the loss of apartment renewals, or negotiating with the landlords (fully aware of the acuteness of the hospitals’ housing needs) for renewals at artificially inflated market rental rates. When, thus, considered in its context within the statutory framework of the rent stabilization laws as a whole, and giving a fair and comprehensive reading to chapter 940’s own legislative history to ascertain the ends the Legislature chose to serve in enacting it, surely chapter 940 substantially advances a legitimate State interest, even under the heightened level of judicial scrutiny applied by the majority requiring a close causal nexus between this land use regulation and "the problem sought to be ameliorated” (Rent Stabilization Assn. v Higgins, 83 NY2d 156, 174).
Essentially, chapter 940 restored to nonprofit community hospitals in New York City the protections of the rent stabilization laws they previously enjoyed, against excessive rent increases and landlord profiteering (caused by artificially inflated rental market conditions), protections apparently unintentionally withdrawn by enactment of the OHA. Reinclusion *411 of New York City nonprofit hospitals within the broad class of human tenants and their successor family members subject to rent stabilization directly and undeniably serves the legislative protective and preventive goals with respect to abnormal rental increases and landlord profiteering. Indeed, as I have already shown, the legislative history of chapter 940 easily supports a legislative determination that nonprofit hospitals have special needs to be included within the protective umbrella of the RSL and ETPA.
Moreover, it was entirely reasonable to exempt nonprofit hospital tenancies from the primary tenant residency requirements of the OHA, the purpose of which was to ameliorate an entirely different problem than that addressed by the RSL and ETPA, i.e., primary tenant manipulation and exploitation of the rent stabilization laws in entering into subleases.
Chapter 940 more than satisfies any possibly required heightened level of judicial scrutiny. Its provisions, including the periodic rental increases to which landlords of the hospitals are entitled, are narrowly tailored to minimize if not totally avoid any transfer of wealth from landlords to lessee hospitals (see, Yee v Escondido, 503 US 519, 529-530, supra) as a result of the economic regulation embodied in chapter 940. The absence of any evidence in the record of an adverse economic impact upon plaintiffs as a result of the application of chapter 940 powerfully suggests that the Legislature succeeded in that effort. Certainly plaintiffs have not tendered any less restrictive legislative alternative that would accomplish the protective purposes of chapter 940.
Nor is it of any significance on the takings issue, as the majority implies, that nonprofit community hospitals were singled out among other possibly worthy institutions for the continued benefits of the rent stabilization laws. Surely maintaining the nonprofit hospitals’ "ability to service [their] community’s health care needs” (Beth Israel’s Mailgrams, Bill Jacket, L 1984, ch 940, at 35-37), without adding to health care costs the excessive landlord profits from abnormal rent increases, merits special legislative concern. In Rent Stabilization Assn. v Higgins (83 NY2d 156, supra), we deferred to the expertise of the State Division of Housing and Community Renewal as to "[t]he designation of classes of individuals to whom [the agency] has extended noneviction protection” (id., at 174). The Legislature is entitled to at least the same deference. That the majority may consider chapter 940 to be *412 "underinclusive is, of course, no justification for rejecting it” (Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 487, n 16, supra). "[Congress] need not control all rents or none. It can select those areas or those classes of property where the need seems the greatest” (Woods v Miller Co., 333 US 138, 145).
For all of the foregoing reasons, I conclude that plaintiffs have failed to satisfy their heavy burden of establishing the unconstitutionality of chapter 940 as a regulatory taking in its application to them.
III.
I wish to add some additional comments on the appropriate level of judicial scrutiny in regulatory takings challenges. This Court in Seawall Assocs. v City of New York (74 NY2d 92, supra) read the Supreme Court’s decision in Nollan v California Coastal Commn. (483 US 825) as imposing in all regulatory takings cases a heightened level of judicial scrutiny, i.e., requiring a close causal nexus between the legislative means and ends, in applying the primary per se test of whether the challenged regulation substantially advances a legitimate State interest. We unanimously adhered to that interpretation of Nollan in rejecting the facial challenge to the regulation in Rent Stabilization Assn. v Higgins (83 NY2d 156, supra) and, as I have already outlined in the main body of this dissent, I am confident that chapter 940 satisfies the constitutional standard at the "close causal nexus” level of scrutiny.
Subsequent to our decision in Rent Stabilization Assn, v Higgins (supra), in Dolan v City of Tigard (512 US —, 114 S Ct 2309) the Supreme Court reaffirmed its holding in Nollan and further explained the quantum of the close causal nexus required in Nollan. In Dolan, involving a regulatory taking claim similar in nature to that considered in Nollan, the majority held that the required nexus the municipality had the burden to demonstrate was " 'rough proportionality’ ” (512 US, at —, 114 S Ct, at 2319, supra) between the regulatory exaction from the property owner and the problem it addressed.
Nollan and Dolan both involved the imposition by a governmental land use administrative agency at the State or local level of conditions for discretionary approval of building permit applications by landowners, thereby requiring the landowners to dedicate property rights of permanent physical *413 occupation of their land to the general public. In both cases, the Supreme Court held that the exaction of those conditions would have constituted per se physical takings if instead they had been manifested as direct orders for the landowners to cede rights of physical occupation for some general welfare purpose (see, Nollan, 483 US, at 831, supra; Dolan, 512 US, at —, 114 S Ct, at 2316, supra).
Prior to Dolan, some respected Takings Clause scholars interpreted Nollan as limiting its close causal nexus scrutiny to the regulatory imposition of conditions of permanent physical occupation which would otherwise constitute a per se taking (see, Michelman, Takings, 1987, 88 Colum L Rev 1600, 1608-1609; Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 949-950, nn 146, 149; Tribe, American Constitutional Law § 9-4, at 599, n 20 [2d ed]).
My reading of Dolan leads me now to agree. First, clearly and expressly, Dolan limits its imposition of the burden on the regulator to demonstrate rough proportionality in the " 'essential nexus’ ” (majority opn, at 394) to cases involving administrative agency impositions of suspect conditions of physical occupation. Chief Justice Rehnquist’s majority opinion in Dolan states:
"Justice Stevens’ dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights. See, e.g., Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). Here, by contrast, the city made an adjudicative decision to condition petitioner’s application for a building permit on an individual parcel. In this situation, the burden properly rests on the city” (Dolan, 512 US, at —, n 8, 114 S Ct, at 2320, n 8, supra).
Second, in Dolan Chief Justice Rehnquist contrasted the typical "land use regulation [which] does not effect a taking if it 'substantially advance[s] legitimate state interests’ and does not 'den[y] an owner economically viable use of his land.’ Agins v. Tiburon, 447 US 255”, with the regulatory action at issue in Dolan, where "the city made an adjudicative decision to condition petitioner’s application for a building permit on *414 an individual parcel [and] the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city” (512 US, at —, 114 S Ct, at 2316, supra).
Finally in Dolan, the majority decision justified the application of heightened scrutiny by referring to Nollan’s adaptation of the "well-settled doctrine of 'unconstitutional conditions,’ [under which] the government may not require a person to give up a constitutional right * * * in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit” (512 US, at —, 114 S Ct, at 2317, supra). The Dolan majority also invoked the conclusion in Nollan that without a close connection between the relevant governmental purpose and the required conditional dedication of property, the exaction of a land occupation dedication as a condition for a discretionary permit approval comes down to nothing more than "gimmickry” to obtain an appropriation of property by " 'extortion’ ” without paying for it (512 US, at —, 114 S Ct, at 2317, supra).
Since neither the doctrine of unconstitutional conditions nor the metaphor of municipal extortion masquerading as conditional land development permit approval has ever been invoked to determine the validity of rules merely regulating the use of property, I conclude that the Nollan and Dolan heightened close causal nexus judicial scrutiny is really a judicial response to the special dangers in development permit cases of abuse of the regulatory process to achieve a physical taking of an applicant’s property without just compensation.
Thus, in my view, heightened, close causal nexus scrutiny should not be applied to test the validity of all regulatory taking challenges, and should not have been applied in the instant case, although I am convinced that chapter 940 of the Laws of 1984 can withstand that level of scrutiny. Until either the Supreme Court speaks definitively on whether its rule in Nollan and Dolan applies generally to all regulatory takings challenges, or this Court chooses to reappraise its reading of Nollan as so applying generally to all regulatory taking challenges, I am constrained by stare decisis to apply that level of scrutiny here, and have done so, concluding nonetheless that chapter 940 thus scrutinized is valid.

. See, Radin, The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings (88 Colum L Rev 1667, 1674-1678 [1988]).

. The Takings Clause also protects dominion interests, but this normative aspect more centrally pertains to per se, physical takings or where the claim is that a governmental condemnation cf property violates the Public Use Clause of the Fifth Amendment (see, Hawaii Hous. Auth. v Midkiff, 467 US 229).