[970 NYS2d 200]

In the Matter of NEW YORK STATEWIDE COALITION OF HISPANIC CHAMBERS OF COMMERCE et al., Respondents, v NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE et al., Appellants.

First Department, July 30, 2013

### APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Fay Ng, Leonard J. Koerner, Pamela Seider Dolgow, Mark Muschenheim* and *Jasmine M. Georges* of counsel), for appellants.

*Latham & Watkins, LLP*, Washington, D.C. (*Richard P. Bress* of the bar of the District of Columbia, admitted pro hac vice, of counsel), for respondents, and *James E. Brandt*, New York City, for The American Beverage Association, respondent.

*Weil, Gotshal & Manges LLP*, New York City (*James W. Quinn, Salvatore A. Romanello* and *Gregory Silbert* of counsel), for The National Restaurant Association, respondent.

*Mololamken LLP*, New York City (*Steven F. Molo* and *Ben Quarmby* of counsel), for The New York Statewide Coalition of Hispanic Chambers of Commerce and another, respondents.

*Rivkin Radler, LLP*, Uniondale (*Evan H. Krinick, Barry I. Levy* and *Brian L. Bank* of counsel), for Soft Drink and Brewery Workers Union, Local 812, International Brotherhood of Teamsters, respondent.

*Reese Richman LLP*, New York City (*Kim E. Richman* of counsel), for The National Alliance for Hispanic Health and others, amici curiae.

*Bromberg Law Office, P.C.*, New York City (*Brian L. Bromberg* of counsel), for The National Association of Local Boards of Health and others, amici curiae.

*King & Spalding LLP*, New York City (*Ann M. Cook* of counsel), for The New York State Conference of the National Association for the Advancement of Colored People and others, amici curiae.

*Watkins, Bradley & Chen LLP*, New York City (*Clifford Y. Chen, Stephanie F. Bradley* and *Adam F. Watkins* of counsel), for New York City Council Members Maria Del Carmen Arroyo and others, amici curiae.

*Featherstonhaugh, Wiley & Clyne, LLP*, Albany (*James D. Featherstonhaugh* of counsel), for The Business Council of New York State, Inc. and others, amici curiae.

*Shapiro, Arato & Isserles LLP*, New York City (*Alexandra A.E. Shapiro, Marc E. Isserles* and *Chetan A. Patil* of counsel), for The Chamber of Commerce of the United States of America and others, amici curiae.

*Friedman Kaplan Seiler & Adelman LLP*, New York City (*Bruce S. Kaplan* and *Yitzchak E. Soloveichik* of counsel), for The Street Vendor Project, amicus curiae.

## OPINION OF THE COURT

Renwick, J.

In this hybrid CPLR article 78/declaratory judgment proceeding, we are called upon to decide the constitutionality of the New York City Board of Health's Sugary Drinks Portion Cap Rule. The Sugary Drinks Portion Cap Rule, dubbed the "Soda Ban," prohibits New York City restaurants, movie theaters and

other food service establishments from serving sugary drinks in sizes larger than 16 ounces. Like Supreme Court, we conclude that in promulgating this regulation the Board of Health failed to act within the bounds of its lawfully delegated authority. Accordingly, we declare the regulation to be invalid, as violative of the principle of separation of powers.

## Factual and Procedural Background

We begin with a background of the regulatory agency and the challenged regulation. Pursuant to New York City Charter § 556, respondent New York City Department of Health and Mental Hygiene (DOHMH), an administrative agency in the executive branch of the City government, is charged with regulating and supervising all matters affecting health in the City, including conditions hazardous to life and health, by, among other things, regulating the food and drug supply of the City, and enforcing provisions of the New York City Health Code.

Respondent New York City Board of Health (Board of Health), established by New York City Charter § 553, is comprised of 11 individuals with relevant experience who were appointed by the Mayor. Pursuant to New York City Charter § 558, the Board of Health is empowered to amend the Health Code with respect to all matters to which the power and authority of DOHMH extend. This includes article 81 of the Health Code (24 RCNY), which sets forth rules regulating City "food service establishments" (FSEs). The Health Code defines an FSE as "a place where food is provided for individual portion service directly to the consumer whether such food is provided free of charge or sold, whether consumption occurs on or off the premises or is provided from a pushcart, stand or vehicle" (NY City Health Code [24 RCNY] § 81.03 [s]). Pursuant to a 2010 Memorandum of Understanding (MOU) between the City's DOHMH and the State's Department of Agriculture and Markets, an FSE is subject to inspection by a local health department only if it generates 50% or more of its total annual dollar receipts from the sale of food for consumption on the premises or ready-to-eat for off-premises consumption.

On May 30, 2012, Mayor Michael Bloomberg announced the Portion Cap Rule, a proposed amendment to article 81, that would require FSEs to cap at 16 ounces the size of cups and containers used to offer, provide and sell sugary beverages. The Mayor's stated purpose of the rule was to address rising obesity rates in the City. On June 1, 2012, 14 members of the New York

City Council wrote to the Mayor opposing the proposal and insisting that, at the very least, it should be put before the Council for a vote. This did not occur.

Instead, on June 12, 2012, DOHMH presented to the Board of Health the proposed amendment to article 81. The Board voted to allow DOHMH to publish the proposal in the City Record, and thereby provide the public with an opportunity to comment on the proposal in advance of a public hearing. On July 24, 2012, a public hearing was held on the Portion Cap Rule. Of the more than 38,000 written comments received prior to the scheduled hearing, approximately 32,000 (84%) supported the proposal and approximately 6,000 (16%) opposed it. In addition, a petition opposing the proposal, signed by more than 90,000 people, was submitted by New Yorkers for Beverage Choice, a coalition of individuals, businesses, and community organizations.

DOHMH proposed no changes to the initial proposal that was made public in May. Instead, DOHMH provided the Board with a memorandum, dated September 6, 2012, summarizing and responding to the testimony and written comments (DOHMH, Bureau of Chronic Disease Prevention & Tobacco Control, *Summary and Response to Public Hearing and Comments Received Regarding Amendment of Article 81 of the New York City Health Code to Establish Maximum Sizes for Beverages Offered and Sold in Food Service Establishments*, Sept. 6, 2012, available at http://www.nyc.gov/html/doh/downloads/pdf/boh/article81-response-to-comments.pdf). In the memorandum, which supported the promulgation of the Portion Cap Rule, DOHMH pointed out, among other things, that "[t]he scientific evidence supporting associations between sugary drinks, obesity, and other negative health consequences is compelling" (*id.* at 3). In addition, DOHMH pointed out that the proposed rule would have a "material impact" on consumption of sugary drinks because "[p]atterns of human behavior indicate that consumers gravitate towards the default option" (*id.* at 6). Thus, DOHMH concluded "If the proposal is adopted, customers intent upon consuming more than 16 ounces would have to make conscious decisions to do so" (*id.*). With regard to the critics' assertion that the rule would result in economic hardship for certain businesses, the agency responded that the freedom to sell large sugary drinks "means little compared to the necessity to protect New Yorkers from the obesity epidemic" (*id.* at 8 [emphasis omitted]).

On September 13, 2012, the Board of Health met for the board members to cast their votes on the Portion Cap Rule. Before the vote, both the Commissioner of Health and several board members echoed DOHMH's comments about the Portion Cap Rule, as expressed in the aforementioned memorandum. In the end, the Board voted to adopt the Portion Cap Rule, and a "Notice of Adoption of an Amendment (§ 81.53) to Article 81 of the . . . Health Code" was published in the City Record on September 21, 2012, to go into effect on March 12, 2013 (City Rec, Sept. 21, 2012 at 2602).

As adopted, the Portion Cap Rule limited the maximum self-service cup or container size for sugary drinks to 16 fluid ounces for all FSEs within New York City, and defined "sugary drink" as a nonalcoholic carbonated or noncarbonated beverage that is sweetened by the manufacturer or establishment with sugar or another caloric sweetener, has greater than 25 calories per 8 fluid ounces of beverage, and does not contain more than 50% of milk or milk substitute by volume as an ingredient (NY City Health Code [24 RCNY] § 81.53).[1] The rule thus targeted non-diet soft drinks, sweetened teas, sweetened black coffee, hot chocolate, energy drinks, sports drinks, and sweetened juices, but contained carve-outs for alcoholic beverages, milkshakes, fruit smoothies and mixed coffee drinks, mochas, lattes, and 100% fruit juices. In addition, DOHMH announced that the Portion Cap Rule would apply only to those FSEs subject to the agency's inspections under the MOU. As a result, the ban applies to restaurants, delis, fast-food franchises, movie theaters, stadiums and street carts, but not to grocery stores, convenience stores, corner markets, gas stations and other similar businesses.

On October 12, 2012, before the rule went into effect, petitioners commenced this action seeking to invalidate the Portion Cap Rule.[2] Petitioners alleged that the Board's adoption of the Portion Cap Rule was ultra vires in that it usurped the role of the City Council and imposed social policy by executive fiat, contending that the Board "may not bypass the legislature, under the guise of public health, and make fundamental policy

---

1. The rule set a maximum fine of $200 for each violation.

2. Petitioners are several interest groups, namely, the New York Statewide Coalition of Hispanic Chambers of Commerce, The New York Korean-American Grocers Association, Soft Drink and Brewery Workers Union, Local 812, International Brotherhood of Teamsters, The National Restaurant Association, The National Association of Theatre Owners of New York State, and The American Beverage Association.

choices and establish far-reaching new policy programs all by themselves, no matter how well-intentioned they may be."

Supreme Court declared the regulation invalid, primarily on the ground that by adopting the Portion Cap Rule, the Board of Health exceeded its authority and violated the separation of powers doctrine as delineated in *Boreali v Axelrod* (71 NY2d 1 [1987]) (2013 NY Slip Op 30609[U] [2013]). It also found that the rule itself was arbitrary and capricious. This appeal ensued.

## Discussion

At the outset, we agree with Supreme Court that the starting point for the analysis of whether the subject regulation violates the separation of powers doctrine is the Court of Appeals' landmark decision in *Boreali*. Respondents, however, argue that *Boreali* does not apply to the present case because the Board of Health has been vested with the power to act on any health related manner. This argument rests on a fundamental misunderstanding of the power of administrative agencies vis-à-vis the legislature. The misunderstanding may be readily clarified.

Respondents correctly point out that local public bodies, such as the Board of Health, may be delegated a broad range of powers which are essentially legislative in nature (*People v Blanchard*, 288 NY 145 [1942]). The Board of Health, however, has no inherent legislative power. It derives its power to establish rules and regulations directly and solely from the legislature, in this case, the City Council (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 356 [1985]; *see also Subcontractors Trade Assn. v Koch*, 62 NY2d 422 [1984]).[3]

The separation of powers doctrine of the State Constitution establishes the boundaries between actions of the legislature and an administrative agency. Because the constitution vests legislative power in the legislature, administrative agencies may only effect policy mandated by statute and cannot exercise sweeping power to create whatever rule they deem necessary. In other words, "[a]s an arm of the executive branch of govern-

---

**3.** The Charter of the City of New York provides for "distinct legislative and executive branches" (*Under 21, Catholic Home Bur. for Dependent Children*, 65 NY2d at 356). Section 3 designates the Mayor as "chief executive officer of the city," while section 21 vests the exclusive legislative power in the Council (*id.*). In general, these coequal branches of government may not unlawfully infringe on each other's prerogatives (*id.*; *see also Subcontractors Trade Assn.*, 62 NY2d 422).

ment, an administrative agency may not, in the exercise of rule-making authority, engage in broad-based public policy determinations" (*Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156, 169 [1993], *cert denied* 512 US 1213 [1994], citing *Boreali*, 71 NY2d at 9).

Ultimately, the Board of Health has failed to distinguish its action from the action of the analogous administrative body in *Boreali*. As here, the state legislature in *Boreali* gave the Public Health Council (PHC) broad authority to promulgate regulations on matters concerning public health. Still, *Boreali* held, the scope of the PHC's authority under its enabling statute was deemed limited by its role as an administrative, rather than a legislative body (*Boreali*, 71 NY2d at 9).

We must then examine whether the Board of Health exceeded the bounds of its legislative authority as an administrative agency when it promulgated the Sugary Drinks Portion Cap Rule. *Boreali* illustrates when the "difficult-to-demarcate line" between administrative rulemaking and legislative policymaking has been transgressed. In *Boreali,* the PHC promulgated regulations prohibiting smoking in a wide variety of public facilities following several years of failed attempts by members of the state legislature to further restrict smoking through new legislation. *Boreali* found the regulations invalid because, although the PHC was authorized by the Public Health Law to regulate matters affecting the public health, "the agency stretched that statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be" (*id*. at 9).

*Boreali* relied on four factors in finding that the PHC's regulations were an invalid exercise of legislative power. First, *Boreali* found the PHC had engaged in the balancing of competing concerns of public health and economic costs, "acting solely on [its] own ideas of sound public policy" (*id*. at 12). Second, the PHC did not engage in the "interstitial" rulemaking typical of administrative agencies, but had instead written "on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (*id*. at 13). Third, the PHC's regulations concerned "an area in which the Legislature had repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions" (*id*.). *Boreali* found that the separation of powers principles mandate that elected legislators rather than

appointed administrators "resolve difficult social problems by making choices among competing ends" (*id.*). Fourth, *Boreali* found that the agency had overstepped its bounds because the development of the regulations did not require expertise in the field of health (*id.* at 14).

According to *Boreali*, these "coalescing circumstances," when viewed in combination, paint a portrait of an agency that has improperly assumed for itself " '[t]he open-ended discretion to choose ends,' which characterizes the elected Legislature's role" (*id.* at 11 [citation omitted]). *Boreali* went on to say that none of the four factors, standing alone, is sufficient for a finding that the administrative agency has violated the separation of powers (*id.*). This characterization indicates to us that, contrary to the Board of Health's suggestion, *Boreali* intended the four factors to be interpreted as indicators of the usurpation of the legislature, rather than a talismanic rule of four required elements that must all be present in every case.

Indeed, one year later, in *Matter of Campagna v Shaffer* (73 NY2d 237, 243 [1989]), the Court explained that "[a] key feature of [the *Boreali*] case . . . was that the Legislature had never articulated a policy regarding . . . public smoking." Subsequently, the courts have consistently held that so long as an action taken by an administrative agency is consistent with the policies contemplated by the legislature, the action taken will survive constitutional scrutiny under the doctrine of separation of powers (*see e.g. Higgins*, 83 NY2d 156; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340 [1991]; *Matter of Campagna*, 73 NY2d 237).[4]

In any event, we find that all four *Boreali* factors indicative of the usurpation of legitimate legislative functions are present in this case. Turning to the first *Boreali* factor—balancing competing concerns of public health and economic costs—the Court found that the PHC's promulgation of comprehensive regulations that banned smoking in some public places was not consistent with the authority provided by the legislature under the

---

4. For instance, in *New York State Health Facilities Assn. v Axelrod*, the Court upheld a Medicaid patient access regulation adopted by the PHC, which required new applicants seeking nursing home approval to agree to admit "a reasonable percentage of Medicaid patients" (77 NY2d at 344). Such regulation did not exceed the scope of legislative power delegated to the PHC because it was an "appropriate means for achieving [legislative] ends" (*id.* at 348). This is because the pertinent statutory provisions directed that the PHC should consider a facility's responsiveness to Medicaid patients and take steps designed to prohibit discrimination against Medicaid patients (*id.* at 347-348).

Public Health Law to promulgate regulations on matters concerning public health (71 NY2d at 12-13). The Court pointed to the PHC's inclusion of exceptions and exemptions that reflected the agency's own balancing of economic and social implications of the regulations as clear evidence that the regulatory scheme was inconsistent with the agency's legislative authority (*id.*). Specifically, the PHC had exempted certain establishments, such as bars and certain restaurants, from the indoor smoking bans (*id.* at 12). This effort to "[s]trik[e] the proper balance among health concerns, costs and privacy interests . . . is a uniquely legislative function" (*id.*). According to *Boreali*, the presence of exemptions is particularly telling because exemptions typically "run counter to such goals and, consequently, cannot be justified as simple implementations of legislative values" (*id.*). The exceptions did not, therefore, reflect the agency's charge to protect public health but instead reflected the agency's own policy decisions regarding balancing the relative importance of protecting public health with ensuring the economic viability of certain industries (*id.*).

Likewise, in this case, it cannot be said that the Board of Health acted solely with a view toward public health considerations when it adopted exemptions to the Portion Cap Rule. Indeed, during the public comment period and hearings both DOHMH and the board members themselves indicated that they weighed the potential benefits against economic factors. The Commissioner went as far as to indicate that in addition to promoting health, the ban would help ameliorate obesity-related health care expenditures in New York.

These comments alone do not convince us that the Board of Health considered non-health factors. Rather, we find particularly probative the regulation's exemptions, which evince a compromise of social and economic concerns, as well as private interests. As indicated, the regulatory scheme is not an all-encompassing regulation. It does not apply to all FSEs. Nor does it apply to all sugary beverages. The Board of Health's explanations for these exemptions do not convince us that the limitations are based solely on health-related concerns.

With regard to the exemption for sugary milk or juice drinks, the agency explained that it is based on the Board's conclusion that they, unlike the covered drinks, have some nutritional benefits. The agency, however, ignores the fact that the "soda ban" does more than just target a specific food category. It also ignores that the Board has never categorized soda and the other

targeted sugary drinks as inherently unhealthy. In essence, as DOHMH acknowledges, it prescribes a mechanism to discourage New Yorkers from consuming those targeted sugary drinks by dictating a maximum single portion size that can be made available in certain food service establishments. Such mechanism necessarily looks beyond health concerns, in that it manipulates choices to try to change consumer norms.

Indeed, since a basic premise of the ban is that New Yorkers consume excessive quantities of sugary drinks, the Board's decision to regulate only these drinks requires that any health concerns be weighed against consumer preferences for such drinks. Instead of offering information and letting the consumer decide, the Board's decision effectively relies upon the behavioral economics concept that consumers are pushed into better behavior when certain choices are made less convenient. For instance, the regulation makes the choice to drink soda more expensive, as it costs more to buy two 16-ounce drinks than to buy one 32-ounce drink. As a result, the Board necessarily concluded, as a threshold matter, that health concerns outweigh the cost of infringing on individual rights to purchase a product that the Board has never categorized as inherently dangerous. As the intense public debate on the ban bears out, this threshold decision to regulate a particular food is inherently a policy decision.[5] Such decision necessarily reflects a balance between health concerns, an individual consumer's choice of diet, and business financial interests in providing the targeted sugary drinks. In this context, the "Soda Ban" is one especially suited for legislative determination as it involves "difficult social problems," which must be resolved by "making choices among competing ends" (*Boreali*, 71 NY2d at 13).

With regard to the exemption of certain FSEs (i.e., grocery markets, 7-11s, bodegas, etc.), DOHMH does not deny that the exemption has no relationship to health-related concerns. Still, the agency argues that it was not based on impermissible reasons, but on the agency's allegedly reasonable view that such FSEs cannot be regulated by the agency under the MOU signed with the State's Department of Agriculture. However, the

---

5. *See e.g.* Editorial, *A Ban Too Far*, NY Times, May 31, 2012; Michael M. Grynbaum, *New York Plans to Ban Sale of Big Sizes of Sugary Drinks*, NY Times, May 30, 2012; Editorial, *New York Soda Cap Wouldn't Beat Obesity*, USA Today, June 3, 2012; Editorial Bd, *Slurping Less Soda in New York*, Washington Post, June 2, 2012; Paul Whitefield, *Life, Liberty and the Pursuit of Doughnuts and Big Gulps*, Los Angeles Times, June 1, 2012.

12

Board's claim that the MOU tied its hands is belied by the fact that the agency has previously used its regulatory authority to promulgate city-wide health rules that regulate all FSEs (*see e.g.* NY City Health Code [24 RCNY] §§ 181.07 [city-wide regulation of common eating and drinking utensils]; 71.05 [city-wide prohibition on the sale of "any food . . . which is adulterated or misbranded"]). Moreover, the MOU envisions "cooperative efforts between the two agencies" to "assure comprehensive food protection" and "to avoid gaps in food surveillance." Yet, the agency offers no evidence of any prior attempt to coordinate with the Department of Agriculture on the Portion Cap Rule. The failure to obtain such expansion resulted in a ban that includes exceptions which necessarily favor some businesses and products at the expenses of others.

Accordingly, the selective restrictions enacted by the Board of Health reveal that the health of the residents of New York City was not its sole concern. If it were, the "Soda Ban" would apply to all public and private enterprises in New York City. By enacting a compromise measure—one that tempered its strong health concerns with its unstated but real worries about commercial well-being, as well as political considerations—the Board necessarily took into account its own non-health policy considerations. Judged by its deeds rather than by its explanations, the Board of Health's jurisdictional rationale evaporates.

The second *Boreali* factor is whether the Board of Health exceeded its authority by writing on "a clean slate" rather than using its regulatory power to fill in the details of a legislative scheme. It cannot be seriously disputed that administrative agencies like DOHMH play an important role in rulemaking, particularly in the context of broadly worded legislation that sets out general policy goals and program parameters. In this context, administrative agencies engage in what is known as interstitial rulemaking. Interstitial rulemaking is the process of filling in the details of a broad legislative mandate and making that legislation operational (*Boreali*, 71 NY2d at 13).

Conversely, when an agency's action goes beyond filling in the details of a broad legislative scheme, it exceeds the limits of its authority. This was the case in *Boreali* where there was no legislation authorizing the PHC to regulate smoking in public places. Consequently, the PHC was left to make policy choices that were appropriately for the legislature. The PHC "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (*id.* at 13). Therefore,

*Boreali* held that the PHC's actions were "a far cry from the 'interstitial' rule making" (*id.*).

Similarly, in the case at bar, contrary to the Board of Health's argument, in adopting the Sugary Drinks Portion Cap Rule, the Board did not fill a gap in an existing regulatory scheme but instead wrote on a clean slate. In fact, the Board of Health does not dispute that neither the state legislature nor the City Council has ever promulgated a statute defining a policy with respect to excessive soda consumption, the purported subject of the regulation. Instead, the agency points to the City Charter's grant of broad authority to the Board of Health to regulate "all matters affecting the health of the City." The Board argues that the Portion Cap Rule fits comfortably within this broad delegation of power to adopt sanitary regulations dealing with matters affecting the "promotion and protection of health." However, the Board's general jurisdiction statute, although seemingly broad in scope, does not authorize the Board's action.

We think it clear that this general language does not empower the Board of Health to promulgate rules regulating the conduct of the people of the City of New York with respect to all matters having some relation to the public health. If the words of the statute should be so construed, this indeed would be unfettered delegation of legislative power. As *Boreali* explicitly held, "[E]nactments conferring authority on administrative agencies in broad or general terms must be interpreted in light of the limitations that the Constitution imposes" and "[h]owever facially broad, a legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits" (*Boreali*, 71 NY2d at 9). In fact, the City Charter itself provides that the Board of Health may exercise its power to modify the health code as long as it is "not inconsistent with the constitution" or with the laws of the state and the City Charter (*see* NY City Charter § 558 [b]).

In our view, the City Charter's Enabling Act, granting the Board of Health explicit power to establish, amend, and repeal the Health Code, was clearly intended by the legislature to provide the agency with the discretion to engage in interstitial rulemaking designed to protect the public from inherently harmful and inimical matters affecting the health of the City (*see e.g. Grossman v Baumgartner*, 17 NY2d 345 [1966] [Court upheld a provision of the Health Code of the City of New York prohibiting, for health reasons, tattooing of a child under 16 years old except by a licensed physician and only for medical

purposes]). The general terms employed in the Enabling Act must be construed in relation to the more specific duties imposed and the powers conferred by the act taken as a whole. When thus construed, the general terms are restricted, expressing the true intent and meaning of the legislature. Indeed, although the legislature intended to rely on the Board of Health's expertise in identifying and determining how to regulate inherently harmful matters affecting the health of the City, the Charter provides examples of these general functions when it explicitly grants the agency the power to supervise and regulate the safety of the water and food supplies, as well as the control of diseases (*see e.g.* NY City Charter § 556 [c] [2], [7], [9]).

If soda consumption represented such a health hazard, then the Sugary Drink Portion Cap Rule would be exactly the kind of interstitial rulemaking intended by the legislature and engaged in by the Board of Health in the past. The Board of Health, however, does not claim that soda consumption can be classified as such a health hazard. Rather, the hazard arises from the consumption of sugary soda in "excess quantity." The risks of obesity and developing diabetes and other illnesses are greater in those who drink soda to excess than in those who drink it in moderation or not at all. Thus, since soda consumption cannot be classified as a health hazard per se, the Board of Health's action in curtailing its consumption was not the kind of interstitial rulemaking intended by the legislature.

With regard to the third factor, *Boreali* placed significance on the fact that the legislature had repeatedly tried to pass legislation implementing indoor smoking bans, yet had failed to do so. In the Court's view, this *Boreali* factor was indicative of the legislature's inability to agree on "the goals and methods that should govern in resolving" the issue (*Boreali*, 71 NY2d at 13). In this context, an agency's attempt to "take it upon itself to fill the vacuum and impose a solution of its own" is improper (*id.*). Significantly, *Boreali* distinguished the case of failed legislative action from mere inaction, to which it did not ascribe the same significance (*id.*). Therefore, mere legislative inaction on a particular issue should not satisfy this factor.

The situation here is similar to that of the smoking ban in *Boreali*. Over the past few years, both the City and State legislatures have attempted, albeit unsuccessfully, to target sugar sweetened beverages. For instance, the City Council has rejected several resolutions targeting sugar sweetened beverages (warning labels, prohibiting food stamp use for purchase,

and taxes on such beverages).[6] Moreover, the State Assembly introduced, but has not passed, bills prohibiting the sale of sugary drinks on government property and prohibiting stores with 10 or more employees from displaying candy or sugary drinks at the "check out counter or aisle."[7] While the Portion Cap Rule employs different means of targeting the sale of certain beverages than those considered by the legislative bodies, it pursues the same end, and thus addresses the same policy areas as the proposals rejected by the State and City legislatures. This is a strong indication that the legislature remains unsure of how best to approach the issue of excessive sugary beverage consumption.

The final *Boreali* factor in assessing whether the administrative agency has exceeded the bounds of its legislative authority is whether any special expertise or technical competence was involved in the development of the regulation that is challenged. In *Boreali*, the PHC attempted to use its broad legislative grant of authority to improve public health by developing what the Court called a "simple code" that banned indoor smoking and exempted certain groups (71 NY2d at 14). No technical competence or agency expertise was necessary to develop the code. That the regulations in question in *Boreali* did not require the agency's specialized expertise indicated to the Court that the agency had engaged in unauthorized policy-making rather than interstitial rulemaking.

Likewise, in this case, we do not believe that the Board of Health exercised any special expertise or technical competence in developing the Portion Cap Rule. The deleterious effects (e.g.

---

**6.** *See e.g.* New York City Resolution No. 1265 (2012) ("Resolution calling upon the New York State Legislature to pass and the Governor to sign legislation that would add an excise tax on sugar sweetened beverages"); New York City Resolution No. 1264 (2012) ("Resolution calling upon the United States Food and Drug Administration to require warning labels on sugar sweetened beverages"); New York City Resolution No. 0768 (2011) ("Resolution calling upon the United States Department of Agriculture to authorize New York City to add certain sugary drinks to the list of prohibited goods for City residents who receive Food Stamp assistance").

**7.** *See e.g.* 2012 Assembly Bill A10010 (Prohibiting the sale of sugar sweetened beverages at food service establishments and vending machines located on government property); 2010 Senate-Assembly Bill S67004, A41004 (Relating to imposition of a tax on beverage syrups and soft drinks); 2011 Assembly Bill A06229A (Providing for the sale, availability and distribution of healthy foods and beverages on school property and at school sponsored functions); 2010 Assembly Bill A10965 (Prohibiting the purchase of food items which are not nutritional with food stamp program coupons or other access devices related thereto).

obesity) associated with excessive soda consumption are well-known. Moreover, despite the City's argument to the contrary, the Board did not bring any scientific or health expertise to bear in creating the Portion Cap Rule. Indeed, the rule was drafted, written and proposed by the Office of the Mayor and submitted to the Board, which enacted it without substantive changes. Under the circumstances, it cannot be said that the Board of Health's technical competence was necessary to flesh out details of the legislative policies embodied in the Portion Cap Rule. We find, therefore, that this factor, albeit less compelling than the others, also weighs in favor of invalidating the Sugary Drinks Portion Cap Rule.

## Conclusion

In sum, we find that under the principles set forth in *Boreali*, the Board of Health overstepped the boundaries of its lawfully delegated authority when it promulgated the Portion Cap Rule to curtail the consumption of soda drinks. It therefore violated the state principle of separation of powers. In light of the above, we need not reach petitioners' argument that the subject regulation was arbitrary and capricious.

Before concluding, we must emphasize that nothing in this decision is intended to circumscribe DOHMH's legitimate powers. Nor is this decision intended to express an opinion on the wisdom of the soda consumption restrictions, provided that they are enacted by the government body with the authority to do so. Within the limits described above, health authorities may make rules and regulations for the protection of the public health and have great latitude and discretion in performing their duty to safeguard the public health.

Accordingly, the order of the Supreme Court, New York County (Milton A. Tingling, J.), entered March 11, 2013, which, inter alia, granted the petition and declared invalid respondent New York City Board of Health's amendment to New York City Health Code (24 RCNY) § 81.53 barring the sale of sugary drinks in a cup or container able to contain more than 16 fluid ounces, and enjoined respondents from implementing or enforcing it, should be affirmed, without costs.

FRIEDMAN, J.P., RICHTER and FEINMAN, JJ., concur.

Order, Supreme Court, New York County, entered March 11, 2013, affirmed, without costs.